# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) 2:17-cr-292 |
| v. | ) |
| | ) |
| MARIO NELSON REYES-ROMERO, | ) |
| | ) |
| Defendant. | ) |

## **OPINION**

**Mark R. Hornak, United States District Judge.**

The Defendant Mario Nelson Reyes-Romero ("Defendant") was administratively removed from the United States in 2011, and he was discovered back in the United States in 2017 without permission from the necessary officials of the federal government, resulting in his indictment for one count of Reentry of Removed Alien, 8 U.S.C. § 1326. (Indictment, ECF No. 1.) Three motions are now pending in this criminal case before the Court.

First, the Defendant seeks dismissal of the Indictment, claiming that the Removal of the Defendant in 2011 was contrary to law. The Defendant's Motion to Dismiss Indictment, ECF No. 14, asserts that the Defendant fulfills all of the elements of the affirmative defense set out in § 1326(d) as a matter of law. The Court agrees, and for the reasons set forth at length in this Opinion, the Court grants the Defendant's Motion to Dismiss Indictment. In so ruling, the Court reaches no conclusion as to whether the Defendant can, should, or will now be removed from the United States in a manner consistent with federal law. But the Court does conclude that the process used to remove him in 2011 was contrary to law and that the Defendant has successfully challenged the 2011 Removal Order under § 1326(d), thus rendering it invalid.

1

Second, the Defendant's Motion for Bond, ECF No. 36, requests that the Defendant be released on bond subject to reasonable conditions. The Motion for Bond is moot in light of the Court's granting of the Defendant's Motion to Dismiss Indictment.

Third, the Government's Motion to Dismiss Indictment, ECF No. 46, requests that the Court dismiss this case with prejudice without reaching the merits of Defendant's Motion to Dismiss. For the reasons set out at length below, the Government's Motion to Dismiss Indictment, ECF No. 46, is denied.

## I.    **Factual Background**

According to the Government, the Defendant, a citizen of El Salvador, entered the United States unlawfully at some point prior to November 2008. (Gov't's Br. in Opp'n, ECF No. 17, at 3.) In 2009, he was convicted in New Jersey state court for the state law crime of second degree aggravated assault.[1] (*Id.*) In 2011, the Department of Homeland Security (DHS) commenced an administrative removal proceeding ("2011 Removal Proceeding") against the Defendant pursuant to 8 U.S.C. § 1228, which authorizes the expedited removal of aliens convicted of "aggravated felonies" as that term is defined under federal law. (*Id.*)

As part of that 2011 Removal Proceeding, the Defendant completed and signed two DHS forms: DHS Form I-826 and DHS Form I-851 (the "Forms"), which are described in detail below. A Final Administrative Removal Order was served on the Defendant on June 23, 2011. (App. to Br. in Supp. of Def.'s Mot. to Dismiss ("Def.'s App.") 21, ECF No. 16 ("2011 Removal Order").) The Defendant was deported and removed to El Salvador in August 2011. (Def.'s App. 11.) The Government alleges that the Defendant was discovered in the Western District of Pennsylvania on

---

[1] In violation of N.J. Stat. Ann. 2C:12-1b(1) (2009).

2

October 3, 2017, but he had allegedly not gone through any administrative or judicial channels to obtain lawful re-admittance to the United States. (ECF No. 17, at 5–6.)

On October 24, 2017, the Defendant was indicted in this District on one (1) count of Reentry of Removed Alien, 8 U.S.C. § 1326. (ECF No. 1.) The Defendant filed his Motion to Dismiss Indictment on November 17, 2017. (ECF No. 14.) The Court held hearings on January 3 and 4, 2018, and the Court authorized supplemental briefing. (ECF Nos. 23, 26, 27.) Due to the time it took for the Government to produce various immigration files, the deadlines for those supplemental briefs were extended considerably. (*See* ECF Nos. 28, 32, 34, 38, 51.) Meanwhile, on February 15, 2018, the Defendant filed his Motion for Bond, and on February 27, 2018, the Government filed its own Motion to Dismiss Indictment. (ECF Nos. 36, 46.) The Court held further hearings on March 1, 2, and 22, 2018. (ECF Nos. 53, 54, 73.) All supplemental briefs have been submitted, and all three Motions are ripe for decision.

## II.    **Defendant's Motion to Dismiss**

The Defendant brings his Motion to Dismiss asserting the affirmative defense to the charge of reentry of removed alien, as set out in 8 U.S.C. § 1326(d). That provision provides an opportunity for the Defendant to collaterally attack the underlying removal order (here, the 2011 Removal Order), which, if successful, defeats a necessary element of the reentry of removed alien offense and requires dismissal of the Indictment. The Defendant argues that his removal from the United States pursuant to the 2011 Removal Order cannot function as a basis for a § 1326 prosecution now because the 2011 Removal Order was premised on illegitimate and ineffective waivers of his rights contained in the two involved Forms (I-826 and I-851). (Def.'s Br. in Supp., ECF No. 15.)

3

## A. **Legal Framework**

"The Fifth Amendment guarantees aliens due process in all phases of deportation proceedings." *Bonilla v. Sessions*, 891 F.3d 87, 91 (3d Cir. 2018). "Fundamental precepts of due process provide an alien subject to illegal re-entry prosecution under 8 U.S.C. § 1326 with the opportunity to challenge the underlying removal order under certain circumstances." *United States v. Charleswell*, 456 F.3d 347, 351 (3d Cir. 2006). Where the underlying removal proceeding "is so procedurally flawed that it 'effectively eliminated the right of the alien to obtain judicial review,' we may invalidate the criminal charges stemming therefrom." *Id.* at 352 (quoting *United States v. Mendoza-Lopez*, 481 U.S. 828, 839 (1987)). A defendant charged with reentry of removed alien under § 1326 may collaterally attack the underlying removal order if the defendant establishes that:

(1) the defendant exhausted any administrative remedies that may have been available;

(2) the deportation proceedings from which the underlying removal order was issued improperly deprived the alien of the opportunity to obtain judicial review; and

(3) the entry of the removal order was "fundamentally unfair."

8 U.S.C. § 1326(d); *Charleswell*, 456 F.3d at 351.

If the collateral attack on the underlying removal order is premised on an alleged invalid waiver of rights associated with a deportation proceeding, the Government has the initial burden to produce the written waiver signed by the defendant. *Richardson v. United States*, 558 F.3d 216, 222 (3d Cir. 2009). The burden then shifts to the Defendant to show by a preponderance of the evidence that the waiver is invalid. *Id.* at 219, 222 n.5. A waiver is invalid if it is not entered into voluntarily and intelligently. *Id.* at 219–20. If the waiver is found to be invalid, the Defendant is excused from showing an exhaustion of administrative remedies. *Id.* at 220 (quoting *United States*

4

v. *Muro-Inclan*, 249 F.3d 1180, 1183 (9th Cir. 2001), for the conclusion that § 1326(d)'s exhaustion requirement "cannot bar collateral review of a deportation proceeding when the waiver of right to an administrative appeal did not comport with due process").

Along the same lines, an invalid waiver of the opportunity for judicial review constitutes a deprivation of judicial review, and, in such a case, the Defendant will also be deemed to meet the second element. *Mendoza-Lopez*, 481 U.S. at 840 (when a waiver of rights related to one's right to judicial review is not entered into intelligently, there is a deprivation of the opportunity for judicial review).

In order to meet the third element, a showing that the underlying removal proceeding was "fundamentally unfair," the Defendant must establish both (a) that some fundamental error occurred and (b) that as a result of that fundamental error, the defendant suffered prejudice. A fundamental error may take the form of a proceeding that "deprives an alien of some substantive liberty or property right such that due process is violated," *Charleswell*, 456 F.3d at 359, or "where an agency has violated procedural protections such that the proceeding is rendered fundamentally unfair." *Id.* at 360. Resulting prejudice requires the Defendant to establish (by a preponderance of the evidence) a reasonable likelihood that the result would have been different if the fundamental error in the removal proceeding had not occurred.[2] *Id.* at 361. Our Court of Appeals has noted that the answer to whether there was prejudice requires the district court to determine whether there is a "reasonable probability" that the Defendant "would have obtained relief had he not been denied the opportunity for direct judicial review of his [removal] order." *Id.* at 362. However, the *Charleswell* Court also noted that "some procedural defects may be so central or core to a

---

[2] This is a higher standard than the "plausible ground for relief from deportation" standard used in the Ninth Circuit. *Charleswell*, 456 F.3d at 361. Our Court of Appeals reiterated that the "reasonable likelihood" standard is "analogous to the standard required of a defendant to prove an ineffective assistance of counsel claim." *Id.*

proceeding's legitimacy, that to require an alien to establish even a 'reasonable likelihood' that he would have obtained a different result establishes too high a burden." *Id.* at 362 n.17.

## B. Discussion

Whether the purported waivers within the Forms are valid impacts this Court's analysis of the first two § 1326(d) elements. Thus, the Court begins its discussion with an analysis of the purported waivers, initially describing both what the Forms themselves show and what the DHS Officers who completed the Forms with the Defendant testified to about them. The Court finds and concludes that the purported waivers in the Forms are invalid both facially and as explained by the Government's witnesses. With this, the Court concludes that the first two elements of the § 1326(d) affirmative defense have been met. Then, the Court analyzes the third element, addressing both fundamental error and prejudice. The Court finds and concludes that the entry of the 2011 Removal Order was the result of "fundamental error" and caused actual prejudice to the Defendant. And beyond that, due to the egregious nature of the fundamental error, the Court also finds and concludes that the 2011 Removal Order was inherently and presumptively prejudicial to the Defendant.

Thus, the Court concludes that the Defendant has met his burden to show that all of the elements of his § 1326(d) affirmative defense are met, and the Defendant's Motion to Dismiss the Indictment is granted.

### 1. The Purported Waivers

Third Circuit law as stated in *Richardson* and Supreme Court precedent as discussed in *Mendoza-Lopez* say that an alien validly waives his rights associated with a removal proceeding only if he does so voluntarily and intelligently. The "waivers" at issue here are located within the two Forms that were presented to the Defendant during his 2011 Removal Proceeding, at the same

6

time, 9:00 AM on June 23, 2011. "In cases where there is a written waiver, this issue frequently comes down to an issue of credibility." *United States v. Meza-Magallon*, No. 17-cr-379, 2017 U.S. Dist. LEXIS 190970, at *14 (E.D. Pa. Nov. 16, 2017). Credibility certainly plays a large role in this case, but what the Forms show on their face is itself rather astounding. The Court first summarizes what the Forms themselves demonstrate. Then, the Court provides an account of what the Government's witnesses testified to with respect to the Forms. Finally, the Court makes its findings and conclusions that the Forms do not evidence valid waivers.

### i. Form I-826

The first Form at issue here, the I-826, is titled, "Notice of Rights and Request for Disposition." (Def.'s App. 106; Ex. H, ECF No. 63-1 (color copy).) The color copy is attached to this Opinion as Exhibit A.[3] The top of the first page of the I-826 reads:

> You have been arrested because immigration officers believe that you are illegally in the United States. **You have the right to a hearing before the Immigration Court to determine whether you may remain in the United States.** If you request a hearing, you may be detained in custody or you may be eligible to be released on bond, until your hearing date. In the alternative, you may request to return to your country as soon as possible, without a hearing.

(*Id.* (emphasis added).) After the remainder of its "Notice of Rights" section, there is a section entitled, "Request for Disposition." There are three options from which the subject (here, the Defendant) may select and initial:

\_\_\_\_\_ o I request a hearing before the Immigration Court to determine whether or not I may remain in the United States.
\_\_\_\_\_ o I believe I face harm if I return to my country. My case will be referred to the Immigration Court for a hearing.

---

[3] The Court has partially redacted the DHS Officers' signatures from the copies of the Forms appended to this Opinion because the publication of complete signatures could pose an identity theft issue to those involved. The appearance of those signatures is not germane to the issues here. The Court has also redacted other non-germane identifying information on the copies of the Forms, including addresses and DHS internal identification numbers. The Defendant's signature is partially redacted as to his surname, but otherwise provided because its appearance is germane to the issues before the Court, as set out below.

       o  I admit that I am in the United States illegally, and I believe that I do not face
          harm if I return to my country. I give up my right to a hearing before the
          Immigration Court. I wish to return to my country as soon as arrangements can
          be made to effect my departure. I understand that I may be held in detention
          until my departure.

(*Id.*) On the Defendant's completed I-826, two boxes are marked with an "X": the first box,

indicating a request for a hearing, and the third box, waiving his right to a hearing. None of the

boxes are initialed. What is more striking than those plainly contradictory choices is the manner

in which these boxes were selected. The first selected option, requesting a hearing, is marked with

a large bold X in black ink, appearing as if the X was reinforced with an additional black X over

it. The other selected option, waiving the "right to a hearing," contains a small thin black X as well

as a light blue slash (or what may better be described as half of an X). The Defendant's signature

under the selections appears in black ink. The signature by DHS Deportation Officer Trushant

Darji in the third and final section of the I-826, entitled "Certification of Service," appears in light

blue ink identical in appearance to the marking on the selected option of "no hearing." Under "Date

and Time of Service," markings indicating June 23, 2011, and 9:00 also appear in that same light

blue ink. (*Id.*) Notably, the I-826 reflects that the Defendant had the I-826 read to him in Spanish,

but also that the Defendant read it himself in English, a language he does not speak. (ECF No. 16,

at 106.)

## ii.    **Form I-851**

The second Form at issue here, the I-851, is a two-page document titled, "Notice of Intent

to Issue a Final Administrative Removal Order." (Def.'s App. 22–23; Ex. J, ECF No. 63-3 (color

copy).) It is attached to this Opinion as Exhibit B.[4] The first page contains information about the

Defendant with a charge indicating that the Defendant is "deportable under section

---

[4] *See supra* note 3.

237(a)(2)(A)(iii) of the Act, 8 U.S.C. 1227(a)(2)(A)(iii), as amended, because you have been convicted of an aggravated felony as defined in section 101(a)(43)(F) of the Act, 8 U.S.C. 1101(a)(43)(F)." (Def.'s App. 22.) The Charge informs the individual that DHS is serving such notice "without a hearing before an Immigration Judge." (*Id.*)

Below that is a section called "Your Rights and Responsibilities," and it indicates that the alien (here, the Defendant) may request withholding of removal under 8 U.S.C. § 1231(b)(3) if he fears persecution in any specific country and that the Defendant may rebut the charges stated on the Form. At the bottom of the first page of the I-851, there is a signature line for "Signature and Title of Issuing Officer." That line contains a signature by the "Issuing Officer" and bears a date and time notation of June 23, 2011, at 10:00. (*Id.*)

The first section at the top of the second page of the I-851 is the "Certificate of Service." (Def.'s App. 23.) Below the signature of the serving officer indicating the Notice of Intent was served (Officer Jose Alicea) is a *checked* box that states "I explained and/or served this Notice of Intent to the alien in the Spanish language." The name of the interpreter, also Jose Alicea, is printed, followed by his signature. Immediately below that line is an acknowledgement of receipt with the Defendant's signature and a date and time notation of June 23, 2011, 9:20 (presumably, A.M.). (*Id.*) Thus, the plain reading of this Form is that it was signed by the Issuing Officer and "issued" forty (40) minutes after receipt was purportedly acknowledged by the Defendant at 9:20 AM that day.

The middle section of the second page of the I-851 provides options for contesting removal or seeking withholding of removal, and it is left blank. (*Id.*)

The final section of the second page of the I-851 has three boxes also *checked*. The first corresponds with the selection, "I do not wish to contest and/or to request withholding of removal."

9

The second *checked* box corresponds with the selection admitting the allegations and charges contained in the form, acknowledging ineligibility for any form of relief from removal, and expressing a wish to be removed to El Salvador. The third *checked* box corresponds with the selection "I understand that I have the right to remain in the United States for 14 calendar days in order to apply for judicial review. I do not wish this opportunity. I waive this right." (*Id.*) The Defendant then signed the corresponding signature block, with a date and time of June 23, 2011, 9:00 written in that section. It is "witnessed" by the interpreter and DHS serving officer, Jose Alicea, with the very same date and time notation. (*Id.*)

Thus, based on the time notations on the face of the I-851 alone,[5] the Defendant supposedly waived his rights to contest removal or apply for judicial review twenty (20) minutes *before* he acknowledged receipt of the Form I-851 and an hour before it was ever "issued." (Def.'s App. 22–23.) When read in conjunction with the I-826, the Defendant supposedly waived all his rights (including to judicial review) on the I-851 at the exact moment that he was served with the I-826, where he had affirmatively indicated his request for a hearing.

Importantly, a *check mark* was used by Officer Alicea when he signed the "Certificate of Service" section at the top of the I-851's second page, and *check marks* also appear in the "I do not wish to contest" portion at the bottom of that page, even though all of the markings on the boxes of the I-826, those next to Defendant's signature and those next to Officer Darji's signature, were "X" marks. Thus, while different notations were made in the selection boxes as between the

---

[5] Officer Alicea testified that all times on both Forms were taken from the very same clock in the DHS office. (ECF No. 30, 89:13–17.)

I-826 and the I-851, the markings in each case attributed to the Defendant switched from Form to Form yet matched the markings attributed to the Officers on each such Form.[6]

### iii. The Government Witnesses' Testimony

In an effort to explain the Forms and place them into the context of the 2011 Removal Proceeding, the Government called two witnesses, both of whom were the DHS Officers whose names and signatures appear on the Forms: Officers Trushant Darji and Jose Alicea. Based on the Court's consideration of all the evidence before it, its own examination of the witnesses, and its personal observations relative to that testimony in open Court, the Court finds and concludes that this testimony was, at key points, internally inconsistent, contradictory in comparison with the content of the Forms, and simply nonsensical. The Court stated just that at several points during the various hearings in this case, and the Government has not contradicted those tentative conclusions. (*See, e.g.*, ECF No. 31, 51:9–54:20; ECF No. 57, 11:1–11 & 47:4–48:1; ECF No. 58, 14:17–17:1; ECF No. 77, 22:18–26:5.) The Court also made tentative findings during the hearings that certain material portions of the Officers' testimony were false.[7] To explain these conclusions, the Court recounts the following excerpts from the evidentiary hearings.[8]

Officer Trushant Darji testified that Form I-826 is served in every removal case to ensure that the presiding DHS officer has an understanding of the alien's intentions and to provide the

---

[6] Officer Darji testified that the Defendant "held the pen" when the Forms were completed. (ECF No. 30, 22:1–8.) Based on its examination of the color copies of the Forms, the ink colors of the various signatures, the switching between check marks and "X" marks, and the fluid nature of the Officers' testimony, the Court harbors substantial doubt that the Defendant personally made the critical notations.

[7] *See, e.g.*, ECF No. 77, 22:21–25 ("[T]he Court is more convinced than ever that the testimony that was offered at the first hearing by the two ICE agents under oath were a combination of nonsense . . . and material portions of the balance of it were lies."); *id.* at 25:5–10.

[8] As detailed below, the Government has informed this Court that is does not rely on or adopt the testimony of the Officers that it called to the stand at the first hearing as to these matters. (Gov't's Resp. Br. in Supp. of Gov't's Mot. to Dismiss, ECF No. 66, at 7.)

alien with notice of certain rights. (Tr. of Proceedings, ECF No. 30, 25:20–30:23.) He testified that DHS officers would advise the alien what the Form was, read everything on the Form to the alien, and explain all of the options for the alien to select from. If the alien selects multiple options as to requesting a hearing or asking for no hearing, a DHS officer would "absolutely" attempt to clarify the alien's desires before other forms were filled out, including by having the alien initial his "real" choice. (*Id.* at 29:10–14.) It is plain that this "standard" process was not followed here, and that the Officers elected to go forward with the notation that the Defendant did not want a hearing, even though they offered no basis to exclude the equally chosen and marked choice that he did seek a hearing. (ECF No. 30, 61:11–62:14 & 72:14–18.) Officer Darji then testified that both Forms would be served together at the same time upon the detainee. (ECF No. 30, 32:12–15.) He later changed his testimony to say that he normally serves the "rights form" (the I-826) first. (ECF No. 30, 33:15–17.) When confronted with the time notations on the Defendant's I-826 and his I-851, Officer Darji acknowledged that it appeared as if all the waivers (and the alleged explanations that would have come along with providing those Forms) happened simultaneously, that is, literally at the same moment in time. (ECF No. 30, 62:2–11.)

Discerning the purpose of the first-page "issuing" signature on the I-851, or where and exactly when the I-851 indicates it was authorized to be served on the detainee, was obfuscated by Officer Darji's convoluted testimony. He first testified that in his general practice (because he had no specific recollection of this particular removal proceeding),[9] charging documents in a removal proceeding would be "signed off" by the DHS officer's supervisor, then signed off by agency attorneys and more supervisors, and then and only then the documents would be served upon the

_____

[9] The Government nonetheless proffered both Officers to testify as to their interpretation of the Forms based on their experience generally with such Forms and/or as lay opinion witnesses. (Tr. of Proceedings, ECF No. 30, 42:3–17.)

12

detainee. (ECF No. 30, 20:17–23 & 22:24–23:3.) However, in an attempt to explain why this I-851 shows service (and waivers of rights) signatures occurring *before* the issuing signature of a DHS supervisor, Officer Darji testified that it was not unusual to complete the "issuing signature" on the face of the I-851 *after* service on the alien because the issuing supervisor "wants to make sure we serve the documents on [the detainee, and] there are no problems with the notice of intent to issue the final order," implying that the "issuing" by a DHS supervising officer actually occurs after the Defendant signed an "un-issued" charging form. (ECF No. 30, 38:2–4.) Immediately thereafter, Officer Darji instead stated that the issuing signature "authorize[s] you to approach the alien with this document." (ECF No. 30, 38:5–7.)

But later, perhaps recognizing that such "issuing" authorization was signed at least forty (40) minutes after presentation of the I-851 to the Defendant, Officer Darji changed his testimony again to say that the "issuing signature's" purpose was to show "that the document was served on the alien," even though the I-851 itself says no such thing on its first page and there is a separate section for certification of service on its second page. (ECF No. 30, 40:6–9.) After a short recess and on re-direct, Officer Darji reversed course again and said that it *actually* was standard practice to complete the "issuing signature" on the first page *after* the document had been served. (ECF No. 30, 64:6–16.) When the Court asked the Officer why he initially gave opposite answers, Officer Darji responded that "[t]hinking about it after I answered the first time, the second answer was more appropriate." (ECF No. 30, 73:12–15.) This response required the Court to follow-up with, "[w]hich answer was true?" To which the Officer responded that the Form would be "signed by the supervisor after we serve them." (*Id.* at 73:19–21.) In terms of this Officer's explanation of the I-851 in this case, the Court finds and concludes that his testimony was at odds with the text and facially stated purposes of the various provisions of the I-851.

Based on the Court's consideration of all of the testimony presented and its observations of his demeanor on the witness stand, his testimony in those regards was false, likely given in an effort to explain away the reality that the Defendant was confronted with and induced to sign the I-851 before it was even "issued" or, as demonstrated below, fully explained to him.

Officer Darji testified that an I-851 would be presented to the detainee and an Officer would go through the first page, top to bottom, and then the second page, top to bottom, explaining everything. (ECF No. 30, 33:23–35:5.) The certificate of service would be completed at the top of the second page, and then the alien would check off what option he wanted, e.g., to contest or not contest removal. (*Id.*) Despite that standard operating procedure, Officer Darji immediately followed that explanation with testimony that it was not unusual for the detainee to waive his rights before the certificate of service was signed "[b]ecause basically the form was signed by the alien down below after he is explained everything, *then* the administrative order was actually served and acknowledged and *explained to him by the native speaker* . . . ." (ECF No. 30, 36:16–23 (emphasis added).) When asked what occurred in the time *after* the detainee actually waived his rights and before the certificate of service is completed, Officer Darji testified that "we would make sure the alien understood everything." (ECF No. 30, 37:3–5.) This, of course, would facially obviate any waiver, as it would have been "made" *before* the required explanation and confirmation of understanding.

The Government's next witness, Officer Jose Alicea, testified that when serving multiple forms, the Officer would serve one Form and then go on to the next Form upon completing the service of the first one. When the Court asked why an Officer would list the same time on the Forms for multiple serial events, Officer Alicea responded that the respective time notations are based on whatever the clock in the room read when it was time to sign. (ECF No. 30, 88:24–89:17.)

14

When Officer Alicea was asked why his signature on the I-851 was time-noted twenty (20) minutes after the Defendant signed the waiver, he testified that the time gap "would have been about the time my explanation was completed." (ECF No. 30, 91:5–8.) In response to a question from the prosecution, Officer Alicea confirmed that those twenty (20) minutes after the purported waiving of rights were used to "read the document in Spanish to the alien." (ECF No. 30, 91:9–12.) This of course means that the Defendant supposedly waived his rights by his signature before they were read to him in Spanish.[10] Immediately thereafter, perhaps sensing the impact of his prior (and then re-confirmed) contrary testimony, Officer Alicea switched gears and testified that he would have read the document to the alien in Spanish *before* the alien made any selection on the I-851. (ECF No. 30, 91:13–15.) The Court concludes that given the times on the Forms, the balance of their content, the overall tenor and content of Officer Alicea's testimony, and his demeanor on the witness stand as observed by the Court, this later statement was false, likely presented by Officer Alicea in an effort to explain away his prior testimony.

Officer Alicea also testified on direct examination that administrative removal proceedings in New Jersey were something that he was commonly involved in (ECF No. 30, 82:7–11), and he did not have a specific recollection of serving the specific Forms at issue in this case. (ECF No. 30, 85:17–19.) Then, in that same direct examination, Officer Alicea also testified that administrative Removal Proceedings were rare in New Jersey, and this specific Removal Proceeding with the Defendant was the only administrative removal proceeding that he could recall being involved with at the New Jersey office. (ECF No. 30, 91:20–92:17.) When the Court asked him about this contradiction, Officer Alicea testified the Defendant's I-851 was the only I-851 he could recall doing. (ECF No. 30, 92:18–24.)

---

[10] Both Forms are printed only in English.

Now that the Court has summarized the content of the Forms and the testimony of the DHS Officers who signed and served those Forms on the Defendant, the Court analyzes the effect of these Forms and that testimony on the issue of waiver.

### iv. The Waivers Are Invalid

The Court concludes that the waivers in the Forms, both in the I-826 and I-851, are facially invalid. The Government has not met its initial burden to produce a facially valid written waiver signed by the Defendant. This I-826 is internally and inherently contradictory on its face. It is impossible to discern whether the Defendant actually waived his rights (including to a hearing), because the Defendant's signature corresponds to a selection both waiving and *not* waiving his rights to a hearing, a hearing the I-826 affirmatively said that he could request. Therefore, the Court cannot conclude that the I-826 presented by the Government is actually what the Government asserts it to be: a waiver.

At one point, the Government posited that the I-826 was actually irrelevant to the case and should be disregarded because the I-851 was the controlling document:

```
THE COURT: You are saying the agents of the United States
Department of Homeland Security required this defendant and
everyone else to go over and to sign a legally pointless
document, the 826?

MR. HALLOWELL: That's my understanding of [the Officers']
testimony, Your Honor.
```

(Tr. of Proceedings, ECF No. 31, 17–22.) Even if that is the actual relationship between the I-851 and the I-826, the Court has to take the case as it is, and the Defendant was given both Forms at the same time, one of which told him he had a right to a hearing. This reason alone shows that any sense of what the Defendant's hearing rights and other rights actually were had become practically indecipherable, and waivers stemming from such transaction could not have been entered into

16

intelligently. As our Court of Appeals acknowledged in *Charleswell*:

> The presence of an affirmative statement concerning an avenue of relief [ ]
> immediately followed by a negative command concerning what the alien may not
> do, creates the impression that "these are the options." Absent any affirmative
> notice to the contrary, and combined with the velocity of the [immigration] process,
> it is simply unrealistic to expect an alien to recognize, understand and pursue his
> statutory right [under applicable laws] to direct judicial review in the appropriate
> court of appeals.

*Charleswell*, 456 F.3d at 357.

The I-851 also suffers from facial defects preventing it from constituting an actual written waiver. The Defendant signed the "waiver" section before it was entirely explained to him in his native language, he signed the waiver section before it was served on him, and it was served on him before it was issued. In short, he supposedly signed away his rights before he was charged and before those rights were read to him in Spanish. The waivers are facially invalid.

But there is more. Even if the Government had met its burden by merely producing a piece of paper *purporting* to be a waiver and containing the Defendant's signature, the Defendant has met his burden to show by a preponderance of the evidence that the waivers are invalid, because it is plain that the waivers were not entered into voluntarily or intelligently. Viewed independently, both Forms facially show either an unintelligent or an involuntary waiver of rights, or in the case of the wholly contradictory statements on the I-826 as to requesting a hearing, no waiver at all. When the Forms themselves are considered in conjunction with the testimony of the DHS Officers, the Court finds and concludes that the option giving up the right to a hearing on the I-826, given that this "selection" was partially made with the same ink color that the DHS Officer used to sign

the form, was not made voluntarily or likely even made by the Defendant.[11] The fact that both options on the I-826 were selected demonstrates that the Defendant did not intelligently (or actually) waive any rights that were described to him through the I-826. The order in which the sections of the I-851 were completed and the manner in which those sections were purportedly completed (based on the portions of testimony that the Court believed to be credible) demonstrates that any waivers in the I-851 were made unintelligently, as the Defendant purportedly waived his rights before the I-851 was fully explained to him *or* served on him.

These conclusions are further corroborated when the time notations on the Forms are read in conjunction with one another, showing the impossibility that the Forms were properly served, explained and translated, and then completed in accordance with all of the time notations. Finally, the very nature of the contradictory explanation of rights on the separate Forms supports the

---

[11] The record also includes a two sets of documents, each titled "Record of Sworn Statement in Affidavit Form," supposedly made and signed by the Defendant. With these documents, the Government attempts to show inconsistencies as to the Defendant's asserted fear of persecution. (Gov't's Resp. in Opp'n, ECF No. 17, at 13 n.7.) The first page is left blank with respect to the Defendant acknowledging receipt or being informed of the nature of the document. (Def.'s App. 116.) It is left blank as to what language was used with the Defendant or whether there was an interpreter. (*Id.*) The "Initials of the Subject" change throughout the document, yet none match the name of the Defendant. (*Id.* at 116, 117, 119.) The signature of the "alien" on the last page does not match the Defendant's name or signature on other Forms. (*Id.*) The initials at the bottom of the first page corresponding to the agent of U.S. Immigration & Customs Enforcement do not appear to match the initials used on the top of that page designating the agent or the signature of the agent on the last page. (*Id.* at 116, 119.) The witness signature on the last page is left blank. (*Id.* at 119.) The second "Record of Sworn Statement" is of the same ilk. (Def.'s App. 124–28.) The name of the person giving the "sworn statement" is left blank. (*Id.* at 124.) Despite the document indicating it was made before a specified Agent in the Spanish language, the name of the interpreter is blank. (*Id.*) The line for the Defendant to write in his own name indicating acknowledgement of receipt is left blank. (*Id.*) While the initials at the bottom of each page bear the letters "MR," the handwriting that appears on these documents bears no resemblance to the handwriting attributed to the Defendant on the Forms. (*Id.*) The "signature of alien" on the last page says "Mario Reyes" but also carries starkly different penmanship from the signatures attributed to the Defendant on the Forms. (*Id.* at 128.) *See United States v. Clifford*, 704 F.2d 86, 90 n.5 (3d Cir. 1983) (The fact finder "can compare a known handwriting sample with another sample to determine if the handwriting in the latter sample is genuine") (citing Fed. R. Evid. 901(b)(3)). This last page, bearing the signature, is attached to this Opinion as Exhibit C. In the Court's estimation, these documents cast further, substantial doubt on the validity of the Forms and their completion.

18

determination that the waivers were not entered into voluntarily and intelligently. *Mendoza-Lopez*, 481 U.S. at 840; *Charleswell*, 456 F.3d at 357.[12]

These two Forms are shams,[13] and the result of the involved Officers electing to run roughshod over not only what they testified were the standard and required DHS procedures, but also over any semblance of due process. To be sure, these assessments are blunt and direct, but in the Court's estimation are compelled by the record. The Forms, and the 2011 Removal reliant on them, are invalid and the Officers' testimony proves it.

## 2. Exhaustion

The Defendant is excused from showing that he exhausted his administrative remedies in light of the invalid waivers. *Richardson*, 558 F.3d at 220 (quoting *Muro-Inclan*, 249 F.3d at 1183, for the conclusion that § 1326(d)'s exhaustion requirement "cannot bar collateral review of a deportation proceeding when the waiver of right to an administrative appeal did not comport with due process"); *see also United States v. Sosa*, 387 F.3d 131, 136 (2d Cir. 2004) ("[T]he exhaustion requirement must be excused where an alien's failure to exhaust results from an invalid waiver of

---

[12] The Government has not conceded that the Forms were completed and executed improperly, nor that the Forms facially demonstrate that the Defendant never actually and knowingly waived his right to a hearing. Rather, it takes the position that it will cease offering evidence or argument on that matter and put all of its chips on the prejudice marker. As the Court previously noted on the record in open court, the Court does not believe or conclude that the Government knowingly presented false testimony from the Officers when those Officers testified, and it in fact attempted (unsuccessfully) to rehabilitate their testimony while they were on the stand. But, as the Court explains below, the Government also does not have the luxury of taking a position of ambivalence as to the testimony it presents from federal agents. *See infra* pp.60–61 (discussing *United States v. Harris*, 498 F.2d 1164, 1169 (3d Cir. 1974)).

[13] The Government has not offered any explanation of the Officers' testimony and/or the Forms that would generate a benign interpretation of their contents or the Officers' testimony. The Government *has* stated that both the witnesses and the U.S. Attorney's Office had not inspected the originals (or color copies) of the Forms prior to the January 3, 2018, hearing. (Gov't's Resp. Br. in Supp. of Gov't's Mot. to Dismiss, ECF No. 66, at 3.) Indeed, the Court was unaware of the existence of the color copies until they were filed on the docket on March 14, 2018. (ECF No. 63.) Regardless, the blue versus black ink differences as seen on the color copies are only one slice of the pie, and serve to affirm the inconsistencies and contradictions already evident in the prior hearings.

the right to an administrative appeal."). Accordingly, the first *Charleswell* element (§ 1326(d)(1)) is satisfied.

### 3. No Opportunity for Judicial Review

By his establishing that the waivers for judicial review were invalid, the Defendant has shown that he has been deprived of judicial review. *Mendoza-Lopez*, 481 U.S. at 840 ("Because the waivers of their rights to appeal were not considered or intelligent, respondents were deprived of judicial review of their deportation proceeding. The Government may not, therefore, rely on those orders as reliable proof of an element of a criminal offense."). The second *Charleswell* element (§ 1326(d)(2)) is satisfied.

### 4. Fundamental Unfairness

Even though Defendant has met the first two elements, to prevail on his Motion to Dismiss, the Defendant must also show that the underlying removal proceeding was "fundamentally unfair." This last element has two sub-parts. First, the Defendant must establish that some fundamental error occurred. Second, the Defendant must show that as a result of that fundamental error he suffered prejudice. To show prejudice, the Defendant must show based on a preponderance of the evidence that there is a "reasonable probability"[14] that the Defendant "would have obtained relief had he not been denied the opportunity for direct judicial review of his [removal] order." *Charleswell*, 456 F.3d at 362. The Defendant is able to meet both such prongs and therefore satisfies the third element.

---

[14] The Court in *Charleswell* uses "reasonable likelihood" and "reasonable probability" interchangeably.

### i. Fundamental Error Occurred[15]

As set out above, the Forms that were intended to lay out the Defendant's rights and his elections regarding their exercise were completed in a manner that deprived the Defendant of any meaningful due process.

First, based on the I-826, at best, the Defendant simultaneously made two contradictory choices as to a request for a hearing and the DHS Officers failed to take any measure to properly address that contradiction, to clarify the Defendant's intentions by asking him to complete a new Form (or initial his selection on the existing Form), or to provide the Defendant with the hearing he had requested (and that the I-826 informed him that he had a right to). This despite the Officers' own testimony that when faced with such inherently contradictory choices, the standard and required procedure was to stop and definitely and definitively confirm the alien's true choice. (Tr. of Proceedings, ECF No. 30, 29:5–21.) At worst, a DHS Officer forged the Defendant's selection on the Defendant's I-826 in an effort to obstruct any rights to a hearing that the I-826 itself purported to offer.

Second, based on the I-851, the Defendant was handed an un-issued Notice of Intent where he was asked to waive further rights to contest removal or to request withholding of removal, twenty (20) minutes before the I-851 says it was received by and/or explained to the Defendant.

Third, all the waivers on both Forms supposedly occurred at the exact same minute, and the Officers testified (and the documents support) that the supposed waivers in reality actually occurred before the Forms were explained to the Defendant.

---

[15] The Government elected not to present any evidence on this prong. (Gov't's Suppl. Resp. in Opp'n, ECF No. 79, at 3 n.1).

21

In an effort to confirm (or not) that facial reading of the Forms, the Court asked DHS

Officer Darji the following while Officer Darji testified under oath:

> THE COURT: So within a few minutes somebody in your
> position would tell somebody that they have the right to
> a hearing. That person would have both requested a
> hearing and said they don't want a hearing. And then
> they would be told they don't get a hearing. Is that
> your testimony, sir?
>
> DHS OFFICER DARJI: This is a generic form, yes.
>
> THE COURT: Okay. But in the circumstance where it is a
> form 851 that is going to be used, in this specific
> circumstance, am I reading these forms inaccurately --
> or actually am I reading them accurately that within
> moments of 9 o'clock in the morning on June 23rd, 2011,
> several things had occurred pretty much all at once.
> This defendant was told he had a right to request a
> hearing. He requested a hearing. He said he didn't want
> a hearing. And he was told he couldn't have a hearing.
> **Am I reading those forms correctly, sir?**
>
> **DHS OFFICER DARJI: Yes.**
>
> **THE COURT: Does that make any sense at all to you, sir?**
>
> **DHS OFFICER DARJI: No, Your Honor.**

(Tr. of Proceedings, ECF No. 30, 61:21–62:14 (emphasis added).)

The Court concludes that the Defendant has shown by a preponderance of the evidence that

DHS violated required and material procedural protections and due process regarding the removal

process such that the 2011 Removal Proceeding was rendered fundamentally unfair. *See*

*Charleswell*, 456 F.3d at 360. Not only was the Defendant deprived an opportunity for review by

an immigration judge ("IJ") based on the I-826, likely because the I-826 was manipulated by the

DHS Officers, but he also was not given sufficient opportunity to understand or review his rights

(including to judicial review) on the I-851 before signing them away.

22

"No society is free where government makes one person's liberty depend upon the arbitrary will of another." *Hahn v. Burke*, 430 F.2d 100, 105 (7th Cir. 1970) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 217 (1953) (Black, J., dissenting)). In effectuating the administrative removal of the Defendant in 2011, the involved DHS Officers acted with fundamental disregard of their obligations under federal law and the Due Process Clause, and that Removal process was contrary to law.

### ii. Fundamental Error Caused Prejudice to the Defendant

The second prong of the third element requires the Defendant to show prejudice. This Court must determine whether there is a reasonable likelihood that the Defendant would have obtained relief had he not suffered from the fundamental errors identified above. *Charleswell*, 456 F.3d at 362. In extreme cases, where the procedural defects are "so central or core to a proceeding's legitimacy," the reasonable likelihood standard becomes too high a burden. *Id.* at 362 n.17. In such an extreme case, prejudice may be presumed. *Id.* (citing *United States v. Luna*, 436 F.3d 312, 321 (1st Cir. 2006)).

The Defendant argues that had the 2011 Removal Proceeding been conducted properly, and his request for a hearing so offered and so selected on the I-826 been honored, the Defendant could have then asserted a claim for asylum, withholding of removal, or Convention Against Torture (CAT) protection, and there is a reasonable likelihood that at least one of those claims would have been successful. The Government argues that the Defendant suffered no prejudice because he was not eligible for asylum or withholding of removal and he could not have asserted a successful CAT protection claim in 2011; therefore, the Defendant would have been deported regardless of any error with the Forms or the 2011 Removal Process.

23

"[R]esolution of the prejudice issue in the § 1326(d)(3) context is somewhat akin to a trial within a trial . . . ." *Charleswell*, 456 F.3d at 362 (internal quotations omitted). After placing itself in the shoes of an IJ around the time of the 2011 Removal Proceeding,[16] the Court concludes that the Defendant had a reasonable likelihood of success on a claim for asylum, a claim for CAT protection, and a claim for withholding pursuant to § 1231(b)(3)(A) had his 2011 Removal Proceeding been conducted without fundamental error. However, beyond that, the Court also concludes that the flaws in the 2011 Removal Proceeding were so central to any notion of a legitimate removal proceeding that prejudice can and must be presumed in this case. Therefore, the Defendant satisfies the prejudice prong of the third element.

### a. Asylum

First, the Government argues that even if the Forms had been executed properly, the Defendant would not have had the opportunity to seek asylum because he is an "aggravated felon"[17] as a result of his New Jersey state conviction for aggravated assault. This status is important, asserts the Government, because aggravated felon status has serious implications in removal proceedings: in the Defendant's case, not only did his aggravated felon status enable DHS to initiate expedited administrative removal proceedings against him,[18] his aggravated felon status also made him *per se* ineligible for asylum. Thus, argues the Government, the Defendant's expedited deportation was unavoidable. The Defendant argues that if he had been properly

---

[16] Of course, the necessity of this Court's considering these issues now by looking in the rearview mirror is solely and completely the result of the actions of the DHS Officers in 2011. If they had followed the law, and what they themselves said they should have done when presented with conflicting elections by the Defendant, there likely would be no need to delve into these issues now, as they would have been addressed one way or the other back then.

[17] As that term is defined at § 101(a)(43)(F) of the Immigration Act, 8 U.S.C. § 1101(a)(43)(F).

[18] Pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable.") and § 1228 (authorizing "expedited" removal of aliens convicted of committing aggravated felonies).

informed of his rights, he would have challenged his aggravated felon status, likely been successful, and could have made a likely successful claim for asylum.

> ### 1. The Defendant was eligible for asylum because he was not an aggravated felon.

The Government is correct that aggravated felons are ineligible for asylum,[19] so whether the Defendant could have had even a possibility of gaining asylum during his 2011 Removal Proceeding depends on whether the Defendant was properly charged by DHS as an aggravated felon.[20]

In the immigration context, an "aggravated felony" includes any "crime of violence [defined in 18 U.S.C. § 16 but excluding purely political offenses] for which the term of imprisonment [is] at least one year." 8 U.S.C. § 1101(a)(43)(F). The Defendant's term of imprisonment in New Jersey exceeded one year. A "crime of violence," 18 U.S.C. § 16, has two alternative definitions:

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

*Id.* Thus, the Court must determine whether the Defendant's New Jersey aggravated assault

---

[19] "But the noncitizen who is not an aggravated felon may seek discretionary relief from removal, such as asylum, provided he satisfies the other eligibility criteria." *Johnson v. Attorney Gen. of U.S.*, 596 F. App'x 117, 123 (3d Cir. 2014). The asylum statute, 8 U.S.C. § 1158, states that "an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime." § 1158 (b)(2)(B)(i). In turn, an alien who has "been convicted by a final judgment of a particularly serious crime" is not eligible for asylum. § 1158(b)(2)(A)(ii). For further discussion on the definition of a "particularly serious crime," in regard to the issues in this case, see *infra* note 38.

[20] The Government also argues that the Defendant could have been charged by DHS as having been convicted of a crime of moral turpitude pursuant to 8 U.S.C. § 1227(a)(2)(A)(i). (*See* Gov't's Resp. to Def.'s Mot., ECF No. 17, at 11 n.5.) However, the DHS did not charge the Defendant under that subsection in the 2011 Removal Proceeding, instead electing to charge him under § 1227(a)(2)(A)(iii). *See* Form I-851, at 1, Ex. B. Thus, the Government's argument is beyond the scope of this collateral attack on this underlying removal order.

conviction qualifies as a "crime of violence" under either prong. If it does, the Defendant is (and was) an aggravated felon for immigration purposes and could not have successfully claimed asylum in 2011. If it is reasonably likely that the Defendant could have successfully challenged his conviction being labeled as a "crime of violence," then he would have been eligible to present an asylum claim, as he would not have been labeled an aggravated felon.

### i.  Section 16(a)

Although courts typically employ the categorical approach to determine whether a state offense meets a federal definition,[21] *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013), if the state offense lists elements in the alternative (e.g., acting knowingly *or* recklessly) and only some of those alternatives fit the federal definition, the court must apply the "modified categorical approach." *Johnson*, 596 F. App'x at 120. Both parties agree that the aggravated assault offense lists elements in the alternative, so the Court must utilize the modified categorical approach when comparing N.J. Stat. Ann. § 2C:12-1(b)(1) (2009)[22] to the definitions in 18 U.S.C. § 16(a) and (b).[23]

Under this modified categorical approach, the Court must "consult a limited class of documents . . . to determine which alternative formed the basis of the defendant's prior conviction" and then determine if that basis meets the definition of a crime of violence. *Descamps v. United States*, 570 U.S. 254, 257 (2013). A court applying the modified categorical approach determines

---

[21] "Under this approach, [courts] look 'not to the facts of the particular prior case,' but instead to whether 'the state statute defining the crime of conviction' categorically fits within the 'generic' federal definition of a corresponding aggravated felony. *Moncrieffe v. Holder*, 569 U.S. 184, 190 (2013) (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 186 (2007)).

[22] The Defendant was convicted of aggravated assault on December 11, 2009, under N.J. Stat. Ann. § 2C:12-1(b)(1). (J. of Conviction and Order for Commitment, Def.'s App. 112.) This statute has been updated since the Defendant's conviction, but for the purposes of this Opinion, the Court relies on the statute as it read on the date of conviction.

[23] Gov't's Suppl. Resp., ECF No. 79, at 6; Def.'s Reply, ECF No. 82, at 7.

the basis of the conviction based on "the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." *Shepard v. United States*, 544 U.S. 13, 16 (2005).

Here is what the Court knows from the *Shepard* materials in this case. First, the statute at issue reads: "A person is guilty of aggravated assault if he: (1) Attempts to cause serious bodily injury to another, *or* causes such injury purposely or knowingly *or* under circumstances manifesting extreme indifference to the value of human life recklessly causes such injury." N.J. Stat. Ann. § 2C:12-1(b)(1) (emphasis added). The New Jersey indictment charged that the Defendant "purposely did attempt to cause serious bodily injury." (Def.'s App. 114, "State Indictment.") The New Jersey Judgment of Conviction and Order for Commitment does not indicate which alternative scienter element served as the basis for conviction. (Def.'s App. 112.) The Defendant pled guilty, and a video and audio recording of his plea colloquy was submitted into the record along with a transcript of the recording. (Def.'s Ex. Q; 2d Suppl. App. to Def.'s Reply to Gov't's Suppl. Resp. ("Def.'s 2d Suppl. App.") 9–11, ECF No. 82.) With the aid of an interpreter, the Defendant answered the following questions during his state court plea colloquy:

DEFENSE ATTORNEY: It's an aggravated assault.

THE COURT: Yeah, but did he attempt -- did he attempt to create serious bodily injury? Significant bodily injury, right?

PROSECUTOR #2: Yeah, serious.

THE COURT: Serious bodily -

(There was a discussion among counsel and interpreter.)

INTERPRETER: I'm sorry, maybe I interpreted incorrectly the question. I apologize. I apologize. The intent--

27

> THE COURT: Okay. Did you intend to commit serious
> bodily injury when you stabbed the individual?
>
> INTERPRETER [on behalf of the Defendant]: No.
>
> PROSECUTOR #1: But you knew about using a knife to
> stab somebody in a fight, you could have caused
> serious bodily injury?
>
> INTERPRETER [on behalf of the Defendant]: Yes.

(Def.'s Ex. Q; Def.'s 2d Suppl. App. 9–11.)

While it is clear from the State Indictment that New Jersey charged the Defendant with an attempt to cause serious bodily injury,[24] the plea colloquy shows that the Defendant did not admit to intending to commit serious bodily injury.[25] After consulting the *Shepard* documents, the Court concludes that the Defendant admitted to recklessly causing serious bodily injury under circumstances manifesting extreme indifference to the value of human life, and that admission of recklessness was the basis for his conviction. To be clear, this is not simply a conclusion that it would be reasonably likely that an IJ would reach this conclusion; it is a conclusion that as a matter of law, the Defendant pled to a reckless level of scienter.

New Jersey defines "recklessly" as:

consciously disregard[ing] a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

---

[24] "[W]here a subsection of the Code defines an offense as an attempt to cause and also as causing serious bodily injury or bodily injury, the attempt is a separate offense." *New Jersey v. McAllister*, 511 A.2d 1216, 1221 (N.J. Super. Ct. App. Div. 1986). "A defendant may be convicted of an offense included in an offense charged whether or not the included offense is an indictable offense. An offense is so included when: . . . (3) It differs from the offense charged only in the respect that a . . . lesser kind of culpability suffices to establish its commission." N.J. Stat. § 2C:1-8(d).

[25] It is well established that attempt cannot be proven without a mental state of specific intent. *Singh v. Gonzales*, 432 F.3d 533, 539 (3d Cir. 2006); *Knapik v. Ashcroft*, 384 F.3d 84, 91 (3d Cir. 2004) ("[T]he concept of an attempted recklessness crime is nonsensical.").

N.J. Stat. § 2C:2-2(b)(3). The Defendant did not plead to the higher level of culpability, which is to act "knowingly," because "[a] person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result." N.J. Stat. § 2C:2-2(b)(2). The nature of the admitted statement, "you knew about using a knife to stab somebody in a fight you *could* have caused serious bodily injury," is insufficient to establish that the Defendant was aware that it was practically certain that his conduct would cause serious bodily injury. (Def.'s 2d Suppl. App. 11 (emphasis added).)

Neither the state trial judge nor the state prosecutor followed up with more specific questions in the colloquy to determine if the level of culpability rose to the level of "knowingly," and there is no evidence in the record that the trial judge made any factual findings as to which level of culpability the Defendant was guilty of. Without more, the Court is left with the admission in the colloquy, which only establishes a recklessness level of culpability.

The question now becomes whether reckless aggravated assault is the type of offense captured by § 16(a). If it is, then the Defendant committed a crime of violence, as defined by 18 U.S.C. § 16(a), and the offense qualified as an aggravated felony under immigration law in 2011, as defined in 8 U.S.C. § 1101(a)(43)(F). If it is not, the Defendant did not commit a crime of violence and would not have been an aggravated felon in 2011.

Contrary to the Government's assertion, [26] the Supreme Court has specifically left unresolved the issue of whether reckless assault crimes qualify as a crime of violence under § 16. *Voisine v. United States*, 136 S. Ct. 2272, 2280 n.4 (2016) ("[O]ur decision today concerning § 921(a)(33)(A)'s scope does not resolve whether § 16 includes reckless behavior."). Noting the open question, our Court of Appeals also declined to answer this question with respect to § 16(b)

---

[26] ECF No. 79 at 7, n.6.

in *Baptiste v. Attorney Gen. of U.S.*, 841 F.3d 601, 607 n.5 (3d Cir. 2016).[27] *Baptiste* also offered no guidance on § 16(a). *Id.* at 606 n.4 ("BIA[28] did not address [§ 16(a)] and so we similarly do not address it here.").

The Defendant argues that our Court of Appeal's 2005 ruling in *Popal v. Gonzales* remains controlling law in the Third Circuit on this point. 416 F.3d 249 (3d Cir. 2005). *Popal* made plain that, for purposes of § 16(a),[29] "crimes with a mens rea of recklessness do not constitute crimes of violence." *Id.* at 251. District courts in our Circuit continue to follow *Popal*. In 2017, the Eastern District of Pennsylvania concluded that a defendant's Pennsylvania aggravated assault conviction, 18 Pa. Cons. Stat. § 2702(a), was not a "crime of violence" under § 4B1.2(a) of the Sentencing Guidelines[30] because the defendant's mens rea did not rise above recklessness.[31] *United States v. Haines*, No. 11-cr-706, 2017 U.S. Dist. LEXIS 180613, at *17 (E.D. Pa. Oct. 30, 2017); *see also Nelson v. United States*, No. 16-cv-3409, 2017 U.S. Dist. LEXIS 5116, at *16 (D.N.J. Jan. 12,

---

[27] "Since we conclude Baptiste's 2009 Conviction falls within our more-circumscribed interpretation of § 16(b), we need not examine to what extent the reasoning of *Voisine* applies in the § 16(b) context to broaden our existing interpretation of the provision. We leave that question for another day." *Baptiste*, 841 F.3d at 607 n.5.

[28] Board of Immigration Appeals

[29] The Court of Appeals narrowed the *Popal* holding in *Victor Jair Aguilar v. Attorney Gen. of U.S.* to only apply to § 16(a) and not § 16(b). 663 F.3d 692 (3d Cir. 2011) ("[C]rimes carrying a mens rea of recklessness may qualify as crimes of violence under § 16(b).").

[30] Section 4B1.2(a) of the Sentencing Guidelines is virtually identical to the language of 18 U.S.C. § 16(a), with the exception that § 16(a) "includes the use of force 'against the *person or property* of another,' while U.S.S.G. § 4B1.2(a)(1) is limited to the use of force 'against the *person* of another.'" *United States v. Haines*, No. 11-706, 2017 U.S. Dist. LEXIS 180613, at *12 n.29 (E.D. Pa. Oct. 30, 2017). As explained in *United States v. Dates*, "the definition of 'crime of violence' in Section 4B1.2(a)(1) mirrors that in Section 16(a), and thus authority interpreting one is generally applied to the other, unless pertinent distinctions — none of which are present here — are present." No. 6-cr-83, 2016 WL 5852016, at *3 (W.D. Pa. Oct. 6, 2016).

[31] In *Haines*, any *Shepard* documents related to the defendant's aggravated assault conviction were lost, so neither party could establish which mens rea element served as the basis of conviction since the statute in question gave alternative levels of culpability: intentionally, knowingly, or recklessness with extreme indifference, and simple recklessness. 2017 U.S. Dist. LEXIS 180613, at *7 (discussing Pennsylvania's aggravated assault statute, 18 Pa. Cons. Stat. § 2702(a)).

2017) (concluding that New Jersey's assault statute could be satisfied by recklessness alone and "under the elements clauses of the Sentencing Guidelines, § 16(a), and the virtually identical language in the ACCA,[32] a crime requiring only recklessness as to the 'use' of force will not qualify as a crime of violence"). In 2016, this Court declined to presume that a guilty plea that failed to specify mens rea qualified as a crime of violence when the divisible statute was not categorically a crime of violence, even though it was "exceedingly unlikely[ ] that his plea arrangement implicated something other than" one of the qualifying mens rea. *United States v. Dates*, No. 6-cr-83, 2016 WL 5852016, at \*3 (W.D. Pa. Oct. 6, 2016).[33]

Thus, the Defendant's underlying conviction cannot as a matter of law qualify as a crime of violence under 18 U.S.C. § 16(a) and is insufficient to support aggravated felon status under 8 U.S.C. § 1101(a)(43)(F).

### ii. *Section 16(b)*

Our Court of Appeals has held that § 16(b) is unconstitutionally vague in the immigration context and therefore invalid. *Baptiste*, 841 F.3d at 615–21. Just recently, the Supreme Court reached the same holding in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). Even though the *Baptiste* and *Dimaya* holdings occurred well after the Defendant's 2011 Removal Proceeding, the Court concludes that there is a reasonable likelihood that had the Defendant not been deprived of his ability to challenge the constitutionality of § 16(b) beginning at that time, he would have ultimately been successful.

---

[32] Armed Career Criminal Act, 18 U.S.C. § 924.

[33] As this Court noted in *Dates*, "[t]he Supreme Court has generated a 'demand for certainty' when determining whether a defendant was convicted of a qualifying offense. *Shepard*, 544 U.S. at 21. In other words, a court must be certain about 'what matters,' which 'is the mens rea to which [a defendant] actually pled guilty.'" 2016 WL 5852016, at \*3 (citing *United States v. Johnson*, 587 F.3d 203, 212–13 (3d Cir. 2009)).

Had the Defendant gotten the ball rolling by using the available mechanisms to challenge his removal at that time, he would have likely ultimately had a successful result. Given that the arguments that were being asserted around that time in these regards in other cases have actually proven successful, the Court concludes that that is enough for the Defendant to carry his burden here.[34] And this approach is consistent with the question at the core of the analysis and holding in *Charleswell*, that is whether there is a reasonable likelihood that the "result" would have been different if the error in the removal proceeding had not occurred. *Charleswell*, 456 F.3d at 362. And contrary to the contention of the Government that this Court is constrained to consider only the state of the law to be applied by the IJ at the initial administrative hearing, ECF No. 79, at 12– 14, the *Charleswell* Court expressly focused on the "result" in the context of the alien advocating his position on direct appeal. 456 F.3d at 362. Since a "fundamental defect" or error that renders a removal proceeding "fundamentally unfair" for purposes of § 1326(d) includes the denial of a statutory right to appeal, this Court is obligated to consider not simply the likely "result" of the Defendant's hypothetical initial hearing before an IJ, but also the "result" of the Defendant's use of all of the legal processes that would have been available to him. *Id.*[35]

The argument that § 16(b) was unconstitutionally vague was indeed successful at our Court of Appeals in *Baptiste*. Baptiste's removal proceedings were instituted only nineteen months after

---

[34] *See United States v. Gonzalez Segundo*, No. 4:10-cr-0397, 2010 WL 4791280, at *10 n.8 (S.D. Tex. Nov. 16, 2010).

[35] That also makes this case fundamentally different than the situation in *United States v. Torres*, 383 F.3d 92 (3d Cir. 2004). In *Torres*, it was conceded that the defendant was provided with a full and fair process, so our Court of Appeals concluded that the IJ's application of then-existing law (later changed) was not a due process violation. *Id.* at 104. *Torres* does not address the situation present here where the process for an IJ hearing and judicial review was stopped dead in its tracks by the actions of the DHS Officers. The question in *Torres* "was whether an error of law denying an alien discretionary relief to which he may have been entitled rendered an otherwise procedurally fair proceeding unfair." *Charleswell*, 456 F.3d at 359. The *Torres* Court "did not address the meaning of 'fundamental unfairness' in the context of a defendant who was challenging some procedural defect in the underlying proceeding," such as the deprivation of the right to administrative remedies and judicial review by DHS officers. *Id.*

32

the Defendant's, and the underlying "aggravated felony" involved there also arose under New Jersey's aggravated assault statute. *Baptiste*, 841 F.3d at 604.

But the constitutionality of § 16(b) was a hot topic in Circuits beyond, and indeed prior to, the Third Circuit's decision in *Baptiste*. For instance, the Tenth Circuit held § 16(b) unconstitutionally vague with respect to an immigration removal proceeding that began in 2012. *Golicov v. Lynch*, 837 F.3d 1065, 1067 (10th Cir. 2016). In *Golicov*, the Defendant was charged as an aggravated felon by DHS in 2012, and he moved to terminate the removal proceedings. *Id.* The Tenth Circuit ultimately vacated the order of removal and remanded the case to the BIA. *Id.* Prior to *Golicov* decision, the Court of Appeals for the Seventh Circuit held § 16(b) unconstitutionally vague, vacating a defendant's sentence. *United States v. Vivas-Ceja*, 808 F.3d 719, 720 (7th Cir. 2015).

These Court of Appeals decisions were largely anchored in the Supreme Court's 2015 *Johnson v. United States* opinion, which declared the parallel ACCA residual clause unconstitutionally vague. *See* 135 S. Ct. 2551. But, earlier Supreme Court dissents and concurrences had questioned the validity of such a residual clause prior to the decision in *Johnson* and the Defendant's 2011 Removal Proceeding. *Id.* at 2562–63; *Sykes v. United States*, 564 U.S. 1, 28 (2011) (Scalia, J., dissenting) ("We should admit that ACCA's residual provision is a drafting failure and declare it void for vagueness."); *Chambers v. United States*, 555 U.S. 122, 134 (2009) (Alito, J., concurring) ("[E]ach new application of the residual clause seems to lead us further and further away from the statutory text."). The argument that § 16(b), which parallels the ACCA's residual clause,[36] is unconstitutionally vague was an argument ripe for the taking at the time that

---

[36] The Supreme Court's respective analyses of the ACCA's residual clause and § 16(b) have "perfectly mirrored" one another. *Jimenez-Gonzalez v. Mukasey*, 548 F.3d 557, 562 (7th Cir. 2008) (comparing *Begay v. United States*, 553 U.S. 137 (2008), and *Leocal v. Ashcroft*, 543 U.S. 1 (2004)). In fact, the Solicitor General stated in his supplemental brief in *Johnson* that § 16(b) "is equally susceptible" to the vagueness issue facing the ACCA residual clause. Gov't's

the Defendant could have (but for the invalid waivers) invoked it at the appropriate proceeding in order to challenge his administrative removal. Indeed, defendants were making the vagueness challenge with respect to the ACCA's parallel residual clause at the time of the Defendant's Removal Proceeding. *See, e.g.*, *United States v. Hammons*, No. 07-cr-1164, 2012 U.S. Dist. LEXIS 4739, at *46 (D.N.M. Jan. 12, 2012).

By the time that such an argument would have worked its way through the appellate structure of the immigration courts to our Court of Appeals, the matter likely would have already been resolved—in the Defendant's favor. After all, similarly situated defendant, James Garcia Dimaya, who was placed in removal proceedings *in 2010*, prevailed on his § 16(b) argument at the Supreme Court (after prevailing in the Ninth Circuit) nearly eight years later. *See* Resp't's Br. at 5–6, *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). Thus, it is reasonably likely that near-identical inputs here would have resulted in a near-identical output.[37] Therefore, it is reasonably likely that the Defendant could have successfully challenged his conviction being labeled as a "crime of violence" under § 16(b) had he been given the opportunity to challenge that label beginning during his 2011 Removal Proceedings.

After analyzing both prongs of § 16, the Court concludes it is reasonably likely that had the Defendant challenged his aggravated felon status when he was removed, he would have ultimately succeeded. Therefore, he would have been eligible to present an asylum claim.[38] The

---

Suppl. Br. at 22, *Johnson*, 135 S. Ct. 2551 (No. 13-7120), 2015 WL 1284964, at *22.

[37] Thus, contrary to the Government's assertion (ECF No. 79, at 14), there is a reasonable likelihood that the Defendant "would have been" Johnson or Baptiste or Dimaya.

[38] The Government also contends that regardless of the aggravated felony issue, the Defendant would have been ineligible for asylum on the basis that his conviction still qualified as a "particularly serious crime" as that term is used in the asylum statute, 8 U.S.C. § 1158(b)(2)(A)(ii). Subsection (b)(2)(B) provides that a "particularly serious crime" encapsulates aggravated felonies *and* any offense that has been so designated by the Attorney General through regulations. 8 U.S.C. § 1158(b)(2)(B)(i)–(ii). The Government does not argue that the New Jersey conviction at issue here is one that is specifically so designated in any regulation. Instead, the Government appears

next question is whether the Defendant had a reasonably likely chance of success on the merits of that asylum claim.

> ### 2. It is reasonably likely that the Defendant's asylum claim in 2011 would have been successful

Multiple members of the Defendant's family have applied for, and in some cases been granted, asylum. Because the Defendant avers he would assert asylum on the basis of the same events from which his family has asserted asylum claims, the Court begins with a summary of those other asylum applications.

First, the Defendant's sister ("Sister"), who purportedly came to the United States in March 2012, sought asylum, and her application remains active. (App. to Def.'s Suppl. Br. Regarding Prejudice ("Def.'s Suppl. App.") 337, ECF No. 69-1; Tr. of Proceedings, ECF No. 31, 94:11–20.) DHS made a finding that there was a "significant possibility" that her claim would be found credible in a full asylum hearing and that she had established a credible fear of persecution. (Def.'s Suppl. App. 349, ECF No. 69-1.) Her hearing has not yet occurred. (ECF No. 31, 94:11–20.) According to Sister's testimony in this case, her application for asylum is based on her history of

---

to argue that case-by-case adjudication could result in an offense that is not an aggravated felony being classified by the immigration courts as a particularly serious crime. (Gov't's Suppl. Resp. in Opp'n, ECF No. 79, at 10.) Our Court of Appeals may have arrived at the conclusion that § 1231(b)(3)(B) permits case-by-case adjudication by the BIA, *see Denis v. Attorney Gen. of U.S.*, 633 F.3d 201, 214 (3d Cir. 2011), but our Court of Appeals has also held in the withholding of removal context that "to be eligible for classification as a 'particularly serious crime,' an offense must be an aggravated felony as defined in the INA at 8 U.S.C. § 1101(a)(43)." *Alaka v. Attorney General of U.S.*, 456 F.3d 88, 104 (3d Cir. 2006).

   *Alaka* addressed a claim for withholding of removal. Nonetheless, this Court sees no persuasive reason why *Alaka*'s statutory construction of a "particularly serious crime" would not equally apply to that same term as it is used in the asylum provision within the same Act. *See Johnson v. Attorney Gen. of U.S.*, 605 F. App'x 138, 144 (3d Cir. 2015) (declining to "decide whether *Alaka* applies in the asylum context or reevaluate that decision because the issue was neither briefed by the parties nor is necessary to resolve this case"). The Court is not persuaded by the Government's argument that although *Alaka* remains valid Circuit law, this Court should disregard it in light of the BIA's later interpretation of the statute, *In re N-A-M-*, 24 I. & N. Dec. 336, 338 (BIA 2007). This Court is bound to follow our Court of Appeals' precedential decisions, and when such a decision remains good law, this Court is not in a position to deviate from that foundational principle on the basis that the BIA (or even other Circuits) disagree. The long and the short of it is that this Court is obligated to recognize that *Alaka* has not been overturned, and remains Circuit precedent. *See Aguilar v. Attorney Gen. of U.S.*, 665 F. App'x 184, 188 n.4 (3d Cir. 2016).

35

suffering abuse and rape in El Salvador, which led to Sister testifying against her rapist and the rapist being convicted and sentenced for that crime. (Def.'s Suppl. App. 356.) As a result, her rapist and his comrades made threats that they "wanted to murder me *and my family*." (*Id.* (emphasis added).) In fact, Sister was involved in subsequent court proceedings against the rapist in 2008. (ECF No. 31, 58:20–23, 60:3–10, 109:10–23.)

The Defendant's mother ("Mother") also had an asylum application with the United States. (ECF No. 31, 106:21–23.) The basis for her application is the situation with Sister (her daughter) because "they were threatening us that they were going to kill us and that they were going to burn down our house." (ECF No. 31, 107:18–108:7.) The threats began in 2008 and continued through 2011, after Mother testified in the trial of Sister's rapist "sometime after September 2010." (ECF No. 31, 108:20–109:23; Def.'s Suppl. App. 356.) According to a 2015 letter from the Department of Justice, the case had not been designated as pending by DHS, so the asylum application was rejected. (Def.'s 2d Suppl. App. 3–4.)

The Defendant's brother ("Brother") was granted asylum on September 9, 2015. (Def.'s Suppl. App. 67–75.) Brother testified that his application was based on his fear of gangs in El Salvador because the gangs threated him *and his family* after he refused to join them. According to the Department of Justice's summary of Brother's testimony, the threats began in November 2011 and increased until his departure from El Salvador in June 2013. (*Id.*)

According to DHS paperwork, the Defendant's cousin ("Cousin") applied for asylum and withholding of removal in November 2012 after entering the United States in March 2012. According to Cousin's application, he testified in a rape trial in Honduras and the alleged rapist's father threatened Cousin *and his family*. That father sent two hit men to kill Cousin and Cousin's brother, and the hit men successfully killed Cousin's brother on February 11, 2011. (Def.'s Suppl.

App. 5.) Then, on April 27, 2011, the father sent four hit men to bomb the home of Cousin and his family, but Cousin and Cousin's mother ("Aunt") managed to escape. (*Id.* at 5–6.) Cousin's application also states that Cousin and his family tried to hide with their family in El Salvador in 2011, but they were discovered (by people associated with the rapist's father), and they decided to come to the United States. (*Id.* at 7.) This matched the Defendant's testimony that when he was removed to El Salvador at the end of 2011 as a result of the Removal Order, he was reunited with his Aunt and returned to the United States with her because "the man was paying good money to have her found." (Tr. of Proceedings, ECF No. 31, 127:7–12.) The current status of Cousin's asylum claim is unknown to the Court.

The Defendant's aunt ("Aunt") also has a pending asylum application because her son was murdered. (ECF No. 31, 111:9–11.) DHS issued "credible fear" findings that Aunt had established a credible fear of persecution. (Def.'s Suppl. App. 57.) The current status of Aunt's asylum claim is unknown to the Court.

Our Court of Appeals summarized the elements of an asylum claim in *Garcia v. Attorney Gen. of U.S.*:

> [A]n application for asylum must establish only that the applicant is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B)(i); 8 C.F.R. § 1208.13(b)(1). An applicant has a well-founded fear of persecution if there is a reasonable possibility that she will suffer it, 8 C.F.R. § 1208.13(b)(2)(i), and a showing of past persecution creates a rebuttable presumption of such a well-founded fear, 8 C.F.R. § 1208.13(b)(1). The persecution must be committed by the government or forces the government is either unable or unwilling to control.

665 F.3d 496, 503 (3d Cir. 2011) (internal quotations and citation omitted). While there is no evidence in the record that the Defendant personally suffered past persecution of any kind, a person

37

need not have suffered personal past persecution to qualify for asylum so long as he or she has a well-founded fear of future persecution.

> To prove a well-founded fear of persecution, an applicant must meet a two-pronged test. First, the applicant must demonstrate a subjective fear of persecution "through credible testimony that [his] fear is genuine." Second, the applicant must show that "a reasonable person in the alien's circumstances would fear persecution if returned to the country in question."

*Pavlov v. Attorney Gen. of U.S.*, 614 F. App'x 55, 62 (3d Cir. 2015) (quoting *Lie v. Ashcroft*, 396 F.3d 530, 536 (3d Cir. 2005)). "Nonetheless, an applicant's fear may be well-founded even if there is only a slight, though discernible, chance of persecution." *Karangwa v. Attorney Gen. of U.S.*, 649 F. App'x 149, 153 (3d Cir. 2016); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987) (noting that a ten percent (10%) chance of being shot, tortured, or persecuted does not preclude "well-founded fear"). This Court also bears in mind the standard it is to apply here: a reasonable likelihood of success of such a claim. In essence, the Court must ask if there is a reasonable likelihood that the Defendant could show a "well-founded fear of future persecution" on the basis of the Defendant's membership in a particular social group, and that the Salvadoran government is unable or unwilling to control that persecution.

The Court concludes that the Defendant meets that burden. First, the Court concludes that he would have demonstrated a sufficiently genuine subjective fear of persecution. The Defendant's testimony in this case is credible and was corroborated by both other testifying (family member) witnesses and the documents produced by the Government. (*See* Tr. of Proceedings, ECF No. 31, 56:4–127:13.) Second, the Defendant satisfies his burden to show that "a reasonable person in the alien's circumstances would fear persecution if returned to the country in question." *Pavlov*, 614

F. App'x at 62. The Defendant is clearly at risk of further persecution on account of membership in a particular social group, his family in which members testified against rapists.[39]

"[A]n applicant for asylum or withholding of removal seeking relief based on 'membership in a particular social group' must establish that the group is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Matter of M- E- V- G-*, 26 I. & N. Dec. 227, 237 (BIA Feb. 7, 2014). "Social groups based on innate characteristics such as sex or family relationship are generally easily recognizable and understood by others to constitute social groups." *Valdiviezo-Galdamez v. Attorney Gen. of U.S.*, 663 F.3d 582, 599 (3d Cir. 2011) (quoting *In re C-A*, 23 I. & N. Dec. 951, 959 (BIA 2006), *aff'd sub nom. Castillo-Arias v. Attorney Gen. of U.S.*, 446 F.3d 1190 (11th Cir. 2006)).[40]

---

[39] This is also why the Government's argument that a one-year time limit for raising asylum claims necessarily bars any claim by the Defendant fails. A major exception to that one-year period is available when changed circumstances exist that materially affect eligibility for asylum. 8 U.S.C. § 1158(a)(2)(B) & (D); 8 C.F.R. § 208.4(a)(4). The record reflects that Sister entered the United States in March 2012, and Mother testified that the threats to the family occurred in 2011, driving Sister to eventually flee the following March. In addition, the events with Cousin and the murder of the Defendant's other cousin occurred within just a few months of the 2011 Removal Proceedings, and the threats against cousin were also directed at Cousin's family. (Def.'s Suppl. App. 5–7.) It is clear from the record that the violence against this family had escalated in 2011 beyond what that family could safely tolerate. *See Singh v. Holder*, 656 F.3d 1047, 1053 (9th Cir. 2011) (remanding case to BIA to consider changed circumstance related to wife's recent attacks in India while husband was in the United States); *Fakhry v. Mukasey*, 524 F.3d 1057, 1063–64 (9th Cir. 2008) (petitioner might qualify for changed circumstances exception when relevant circumstances simply provide further evidence of the type of persecution already suffered rather than a new basis for persecution); *Vahora v. Holder*, 641 F.3d 1038, 1043 (9th Cir. 2011) (concluding IJ plainly erred in its finding that there was no change in conditions when petitioner's family became seriously impacted by renewed unrest in the country including his family's house being burned down and petitioner's brother's disappearance).

[40] On June 11, 2018, the Attorney General issued his Opinion in *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018), in which the Attorney General clarified various several aspects of the legal standard he directed be applied by immigration judges for asylum eligibility, instructing immigration judges to apply the standard for defining a cognizable "particular social group" as was set out in *Matter of M- E- V- G-*, which was on remand from our Court of Appeals. 26 I. & N. Dec. 227. Although the Attorney General questioned in *Matter of A-B-* whether, as to a specific case, "a nuclear family can comprise a particular social group," 27 I. & N. Dec. at 333 n.8, *Matter of A-B-* did not resolve that issue as a general matter, instead clarifying that immigration courts are to apply a more rigorous framework on a case-by-case basis to test the alleged status of a particular social group. What can be said here is that the "particular social group" involved in this "case within a case" is defined by an immutable characteristic, one that is specific, particular, and distinct, namely prosecution witnesses in rape trials and their family members. The Defendant's membership in such specific, particular "social group" is a central reason for the persecution alleged. *Matter of A-B-*, 27 I. & N. Dec. at 317. To be sure, this is not a group or claim defined by a generalized (but real)

39

Despite that concise language, the definition of a "particular social group" is a term that has resulted in varied holdings and applications, including around the time the Defendant was in Removal Proceedings.[41] Applying the law as it was around the time the Defendant would have been asserting his claim for asylum but for the fundamental error is a difficult task given the passage of time and the evolution of events. But in doing so, the Court may and should consider cases in that time frame with facts similar to those in the record in this case.

One case in particular, from the Fourth Circuit in 2011, is notably on point. *Crespin-Valladares v. Holder*, 632 F.3d 117, 120 (4th Cir. 2011). The Crespins, Salvadoran citizens, sought asylum based on events arising from the murder of a cousin in El Salvador. *Id.* Following the murder, Mr. Crespin and his uncle gave descriptions of the murderers to the police and agreed to testify against the murderers, leading to convictions. Around the time of the trial, Crespin and his uncle received death threats. *Id.* Although the uncle received some police protection, all protection ceased when the trial was over. *Id.* Crespin, his wife, and their children entered the United States and applied for asylum based on "membership in a social group consisting of family members of those who actively opposed gangs in El Salvador by agreeing to be prosecutorial witnesses." *Id.* at 121–22. The IJ granted the asylum application for the family, but the BIA vacated, stating "those who actively oppose gangs in El Salvador by agreeing to be prosecutorial witnesses' does not qualify as a particular social group." The Court of Appeals for the Fourth Circuit concluded that the BIA committed legal error because it misunderstood the claimed social group. The *Crespin-*

---

social ill, such as domestic violence broadly defined, a general societal vulnerability (such as a general risk of gang violence), nor a vague assertion of generally ineffective policing in the country of origin. *See id.* at 320, 331, 335. Further, it is a particular social group that exists independently of the asserted harm. Consequently, even if *Matter of A-B-* would be applicable to asylum proceedings that would have begun seven years ago, this Court concludes that on the facts presented here, *Matter of A-B-* does not alter the Court's conclusion that the Defendant likely would have been successful in presenting an asylum petition had he been given the proper opportunity to do so.

[41] *Matter of A-B-*, 27 I. & N. Dec. 316, 331 (A.G. 2018).

*Valladares* Court thoroughly analyzed whether family members of prosecutorial witnesses constituted such a particular social group, and it concluded that it does. *Id.* at 124–26.

This Court concludes that the reasoning of *Crespin-Valladares* persuasively demonstrates the reasonable likelihood that had the Defendant been in a position to move apace with an asylum effort beginning in 2011, he would have been able to establish membership in such a particular social group, as the analysis and outcome in *Crespin-Valladares* demonstrates.[42]

The Defendant has also met his burden to show such persecution would be either committed by the Salvadoran government or by forces the Salvadoran government is either unable or unwilling to control. *See Garcia*, 665 F.3d at 503. In processing Sister's asylum application, an asylum officer of DHS made a finding that the source of the threats had access to "financial wherewithal and societal influence to accomplish his objective of killing [Sister], possibly with the help of police. Current [El Salvador] conditions appear to generally support [Sister's] fear the police might kill her on his behalf." (Def.'s Suppl. App. 359.)[43] Similarly, Cousin had fled to El Salvador but that country was unable to protect him from the same dangerous men.

Furthermore, although it is true that the Salvadoran authorities were helpful and effective in prosecuting Sister's rapist, that assistance occurred before the threats began and is not enough to overcome this evidence of the very real possibility (one recognized by DHS as credible) that the

---

[42] While it is certainly theoretically possible that the outcome in *Crespin-Valladares* may have been different had it been decided today in light of the recent *Matter of A-B-* Opinion, the Court concludes that it is substantially more likely that it would not have been different at all, as the analysis in *Crespin-Valladares* does not vary from the framework clarified in *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018). Simply stated, *Matter of A-B-* does not appear to the Court to call into question the validity of *Crespin-Valladares*.

[43] These findings stem from a "credible fear interview" in the course of an asylum application. A credible fear interview has a different purpose than the actual asylum hearing, but the Court finds DHS's (albeit, preliminary) assessment of these events in El Salvador persuasive when it is being asked to make predictions about the outcome of these very processes. (*See* Joint Stip., ECF No. 87.) The Court also concludes that these findings are corroborated by the testimony of the Defendant's family members.

Salvadoran police would acquiesce to revenge killing in this case. *See De La Rosa v. Holder*, 598 F.3d 103, 110 (2d Cir. 2010).[44]

The Defendant's own cousin was murdered because the perpetrators were unable to kill the brother, a clear example of revenge upon family members (especially a sibling in retaliation for testifying in rape trials). This reality combined with the fact that threats made to Sister also directly referenced her family leads the Court to conclude that it is more than reasonably likely that the credible findings made in Sister's asylum application would have also been made in the Defendant's asylum application in 2011. Combined with all the factors discussed above, the Defendant would have had a reasonable likelihood of success on an asylum claim.

### b. CAT protection

Article 3 of the Convention Against Torture (CAT) provides, without exception, that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Sen. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85; *Khouzam v. Attorney Gen. of U.S.*, 549 F.3d 235, 242 (3d Cir. 2008). In order to receive CAT protection from removal from the United States, the alien must show "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2)–(3). Thus, a claim for CAT protection carries a stricter burden of proof than a claim for asylum. "Torture," for purposes of a CAT claim, must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official

---

[44] In *De La Rosa*, the Court of Appeals for the Second Circuit remanded a BIA final decision and order that had denied the petitioner's CAT claim. The BIA concluded that the petitioner failed to meet the public official requirement because there was evidence that some persons within the Dominican government had taken steps to prevent his torture by investigating the petitioner's complaints and making arrests. The court disclaimed the BIA's assumption that the activity of these officials overcame the other public officials' complicity, the governmental corruption, and the general ineffectiveness of the government to prevent unlawful killings. *De La Rosa*, 598 F.3d at 110.

or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1) (2011). "[O]ne way a petitioner can show that a government acquiesces in torture is if it is 'willfully blind' to such activities." *Torres-Escalantes v. Attorney Gen. of U.S.*, 632 F. App'x 66, 68 (3d Cir. 2015).

The Defendant argues that he likely would have made a successful claim for CAT protection based on the violence inflicted on his family by gangs, by Cousin's attackers in Honduras, and by Sister's rapist in El Salvador. The Government argues that the evidence in the record of the circumstances that the Defendant faced in El Salvador at the time of his 2011 Removal Proceedings does not meet the definition of torture because the circumstances do not meet the "public official" requirement.

First, the Government is correct that the evidence in the record related to gang violence (and their failed attempt at recruiting Brother) occurred after the 2011 Removal Proceeding since Brother testified that the threats began in November 2011 and continued into 2013. (Def.'s Suppl. App. 259.) But it is unclear that the events related to Brother categorically would not have factored into the Defendant's CAT claim because the events are only a few months after the date of the Removal Proceeding on June 23, 2011, and even a cursory review of immigration cases demonstrates the slow pace at which they unfold. While it is also unclear how quickly the threats escalated against Brother and Brother's family (i.e., the Defendant), it is also noteworthy that Brother was granted asylum.

Second, the Government argues that any violence that Cousin and other family members faced in Honduras should also be disregarded as the Defendant must show risk of torture in the proposed country of removal, El Salvador. In response to that geographic distinction argument, the Defendant argues that the violence his family faced in Honduras supports his claim for CAT protection from removal to El Salvador because those family members, who initially sought refuge

43

in El Salvador, also had to flee El Salvador out of fear that their assailants from Honduras would come to El Salvador to attack them. (Def.'s Suppl. App. 5–7.) The Defendant himself testified that the dangerous men who hunted Cousin and his family had found the family while they were in hiding in El Salvador. (Tr. of Proceedings, ECF No. 31, 127:7–12.)

Although the attacks on Cousin and the murder of Cousin's brother occurred in Honduras, the record shows the threats the family faced from dangerous and determined people did not stop at the border and evidenced serious danger. (Tr. of Proceedings, ECF No. 31, 127:7–12.) To be clear, the Defendant's family straddles both sides of the El Salvador-Honduras border. Mother lived thirty minutes from that border, and the family would visit one another across the border for holidays and birthdays. (ECF No. 31, 84:17–85:11; 122:23–123:1.) If the El Salvadoran authorities are "willfully blind" to this violence spilling over into El Salvador, then the events that began in Honduras matter.

For a CAT claim, the Defendant would have to show that he more likely than not faced torture if he was returned home in 2011—a higher standard than an asylum claim—and the evidence with respect to the threats against Cousin, the threats against Cousin's family, and the murder of the Defendant's other cousin is insufficient, alone, to show a reasonable likelihood of success on this claim. While anyone in the Defendant's shoes might well be in fear of possible persecution (indeed likely sufficient fear to warrant asylum protection), there is insufficient evidence to show that those threats *alone* spilled over to create a "more likely than not" threat of torture against the Defendant. However, the events occurred pre-2011 Removal Order, and the Defendant could have included them in any application or claim.[45]

---

[45] The credible testimony of the Defendant's witnesses and the documents in the Defendant's Supplemental Appendix establish that the Defendant's deceased cousin was killed in early 2011 and Cousin had an attempt on his life and his family members' lives who were in his house with him just prior to that time. (Def.'s Suppl. App. 47, 57, 61; *see also supra* Part II.B.4.ii.a.2.)

But there is more in the record. The death threats directed specifically at Sister and Sister's family, combined with the series of events surrounding Cousin and the Defendant's other family members, constitute sufficient evidence to show a reasonable likelihood of success on a claim that the Defendant more likely than not would have faced torture had he returned to El Salvador around the time of the 2011 Removal Proceeding.

With respect to events surrounding Sister and Sister's rapist, the Government claims there is insufficient evidence in the record of Salvadoran government acquiescence. Again, according to family members' testimony, death threats stemming from Sister's rapist began in 2008 and those threats continued through 2011. (ECF No. 31, 108:2–109:23, 116:22–23.) The Government argues that the Salvadoran authorities successfully prosecuted Sister's rapist and there was insufficient evidence that the threats facing Sister in El Salvador would also apply to the Defendant. But, DHS's credible fear findings report in Sister's asylum application, as discussed above, sufficiently rebut the Government's argument that the Defendant would not have been able to meet the "public official" requirement.

This leaves the Government's argument that the threats against Sister do not translate to a substantial risk of torture against the Defendant sufficient for a successful CAT claim. The testimony in the record demonstrates that the threats were often expressed against the family. (ECF No. 31, 94:11–20, 107:18–108:7.) This is where the events with Cousin and Cousin's deceased brother are quite relevant to the Defendant's CAT claim because the Defendant's own family had suffered the death of an individual because that individual's sibling testified in a rape trial. Members of the Defendant's own family were being gunned down because their sibling testified against someone, specifically for rape. When this evidence is combined with DHS's own findings

in its credible fear report for Sister's asylum application that rape and power are often intertwined[46] and Sister's rapist had the power to effectuate revenge killing with the help of state actors,[47] the Court concludes that there is a reasonable likelihood that the Defendant would have succeeded on a claim for CAT protection. (Def.'s Suppl. App. 357–59.)

### c. *Withholding of removal*

The second form of relief from removal at issue in this case is "withholding of removal." The withholding statute, 8 U.S.C. § 1231(b)(3)(A), states that the Attorney General "may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country," but "such withholding is unavailable 'if the Attorney General decides that . . . the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States,' § 1231(b)(3)(B)(ii)." *Denis v. Attorney Gen. of U.S.*, 633 F.3d 201, 213 (3d Cir. 2011). The Government argues that the Defendant's New Jersey conviction for aggravated assault would have been deemed a particularly serious crime, so he would not have been eligible for withholding.

The Court again confronts the term, "particularly serious crime." In the withholding context, an alien convicted of an aggravated felony and sentenced to an aggregate term of imprisonment of at least five (5) years is deemed to have committed a particularly serious crime. 8 C.F.R. § 1208.16(d)(3). But with lesser sentences, the Attorney General has the discretion to make such a determination. *Id.*; *Denis*, 633 F.3d at 213–14. In those cases, whether the alien committed a particularly serious crime is based on a case-by-case analysis of the particular facts and the nature of the crime. *Denis*, 633 F.3d at 214. Once again, however, this Court should not

---

[46] *Id.* ("[T]he rapist's motivation is usually not sex, but power . . . .").

[47] *Id.*

46

engage in such an analysis here, given Circuit precedent: "to be eligible for classification as a 'particularly serious crime,' an offense must be an aggravated felony as defined in the INA at 8 U.S.C. § 1101(a)(43)." *Alaka*, 456 F.3d at 104 (addressing "particularly serious" as that term is used in the withholding of removal statute, 8 U.S.C. § 1231(b)(3)(B)). Because the Defendant does not carry a conviction for an aggravated felony as that term is defined in the INA, *see supra* Part II.B.4.ii.a.1, his conviction could not qualify under Third Circuit law as a "particularly serious crime" for purposes of the withholding of removal statute.

In an effort to circumvent this Circuit's rule in *Alaka*,[48] the Government points to case law involving a conviction under the same New Jersey criminal statute, arguing that there is a high probability that the Defendant would have been found to have committed a particularly serious crime. *See Aguilar v. Attorney Gen. of U.S.*, 665 F. App'x 184, 189 (3d Cir. 2016) (IJ determined the defendant's conviction of New Jersey's aggravated assault statute, N.J. Stat. Ann. § 2C:12–1(b)(1), for which he was sentenced to four (4) years' imprisonment, was a particularly serious crime rendering the defendant ineligible for withholding of removal). *Aguilar* referenced *Alaka* head-on in a footnote, noting that whether Aguilar's New Jersey aggravated assault conviction was an aggravated felony was not addressed by the underlying immigration decision, and neither party raised or briefed the aggravated felony issue on appeal. 665 F. App'x at 188 n.4. Our Court of Appeals, therefore, "declined to address or reevaluate *Alaka*." Without controlling Circuit or Supreme Court authority overruling or abrogating the precedential holding in *Alaka*, this Court declines the Government's invitation to sidestep *Alaka*'s rule that "an offense must be an aggravated felony in order to be classified as a 'particularly serious crime.'" 456 F.3d at 105.

---

[48] *See supra* note 38 (declining to adopt the Government's argument that this Court should disregard *Alaka*).

In order to qualify for withholding of removal, the Defendant must establish that it is more likely than not that his "life or freedom would be threatened in th[e] country [of removal] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." *Churilov v. Attorney Gen. of U.S.*, 366 F. App'x 407, 409 (3d Cir. 2010); 8 U.S.C. § 1231(b)(3)(A). The Court need not revisit its findings and conclusions that the Defendant would have been able to show a membership to a protected social group.[49] "As with asylum, [the applicant] must show that any persecution is on account of a protected ground, but in addition, she must show that such persecution is 'more likely than not' to occur." *Gomez–Zuluaga v. Attorney Gen. of U.S.*, 527 F.3d 330, 348 (3d Cir. 2008). The standard for establishing a claim of withholding of removal is higher than the standard for asylum. *Id.* But it is less stringent than the standard for a claim under CAT. The focus in a withholding analysis is the risk of persecution, and "[t]he burden of establishing a risk of future torture is more stringent than is the burden of establishing a risk of future persecution."[50] *Gelaneh v. Ashcroft*, 153 F. App'x 881, 888 (3d Cir. 2005).

Our Court of Appeals has stated that it is "hardly likely" that one could meet the standard for CAT removal yet fail to meet the standard for withholding if the evidence is the same under both analyses. *Id.* Therefore, in light of the standard applicable in this case (to show a reasonable likelihood of success by a preponderance of the evidence), this Court's analysis of the withholding claim parallels its analysis of the CAT claim. The evidence in the record before the

---

[49] *See supra* Part II.B.4.ii.a.2.

[50] Torture is one such example of persecution. *Long Hao Li v. Attorney Gen. of U.S.*, 633 F.3d 136, 149 (3d Cir. 2011) ("Our oft-quoted, non-exclusive list of examples of persecution 'include[s] threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom.'") (quoting *Cheng v. Attorney Gen. of U.S.*, 623 F.3d 175, 192 (3d Cir. 2010)).
.

Court shows a reasonable likelihood that the Defendant could have successfully shown,

following his 2011 Removal Proceeding, that it was more likely than not that his life or freedom

would be threatened in El Salvador. As with the CAT claim, this conclusion is based on the

Court's review of the matters in the record already described above and the testimony of the

Defendant's family (which the Court finds and concludes was credible). The Court concludes

that the Defendant can show a reasonable likelihood of success on a withholding of removal

claim pursuant to 8 U.S.C. § 1231.

### d. Presumption of prejudice

Even though the Defendant meets the prejudice prong based on the reasonable likelihood

of success on the asylum, CAT, or a withholding claim, the Court also concludes this is the very

case contemplated in *Charleswell* where the procedural defects were so central to the 2011

Removal Proceeding's legitimacy that prejudice must be presumed. 456 F.3d at 362 n.17.[51] While

our Court of Appeals has yet to address a case with facts showing this level of disregard for an

alien's due process rights, trial courts in other Circuits have.

The District of Massachusetts confronted one such case in 2017. In *United States v. Walkes*,

the defendant received a Notice of Intent to Issue a Final Administrative Removal Order

---

[51] That footnote reads:

> Here, it makes sense to require such a burden because Charleswell remains able to show, on the record, how, if at all, the result could have been different. However, as some courts have recognized, this standard is not necessarily fixed. Almost all courts that have established a prejudice standard have done so with scenarios that involved the erroneous denial, by an IJ, of some opportunity to apply for discretionary relief, such as a waiver under section 212(c). *But some procedural defects may be so central or core to a proceeding's legitimacy, that to require an alien to establish even a "reasonable likelihood" that he would have obtained a different result establishes too high a burden. See United States v. Luna*, 436 F.3d 312, 321 (1st Cir. 2006) ("There may be some cases where the agency's violations of a petitioner's rights were so flagrant, and the difficulty of proving prejudice so great that prejudice may be presumed . . . .") (internal citations and quotations omitted).

456 F.3d at 362 n.17 (emphasis added).

(presumably the I-851). No. 15-cr-10396, 2017 WL 374466, at *1 (D. Mass. Jan. 25, 2017). That

DHS officer told the defendant that he had no rights; the defendant was not allowed to see a judge;

he was not given a list of organizations that could provide free legal counsel; he did not receive a

copy of his forms at the end of the meeting; and he indicated on a separate form that he wished to

contest his deportation. *Id.* Based on the "specific facts of this case," the district court found that

prejudice would be presumed. *Id.* at *5. The *Walkes* court acknowledged that (a) the passage of

time; (b) the record in front of the Court; (c) the vacating of the underlying conviction;[52] and (d)

the circumstances of an expedited removal proceeding following a criminal conviction made it

more difficult for the defendant to establish that he would have found some sort of relief had the

process been conducted correctly. *Id.* The *Walkes* court then noted that the deprivation of a right

to appeal was "sufficiently flagrant to justify a presumption of prejudice." *Id.*

In light of the facts here, the Court reaches the same conclusion as the *Walkes* court that

prejudice must be presumed based on the "sufficiently flagrant" deprivation of rights. *Id.* The

record here goes beyond the facts of *Walkes*. *Id.* As explained above, any actual understanding and

exercise of his rights by the Defendant was stopped dead in its tracks by the DHS Officers who

steered the Defendant to waive away his rights (or did it for him) *before* providing an explanation

of such rights to the Defendant.

As in *Walkes*, there are additional factors that support the conclusion that prejudice should

be presumed. First, the dissembling and convoluted testimony of the DHS Officers clouded any

opportunity for this Court to get an accurate idea of what actually happened in the 2011 Removal

Proceeding. While the Court applied the law to the facts in the record with respect to claims for

---

[52] Walkes's guilty pleas from prior state court convictions were vacated pursuant to *Padilla v. Kentucky*, 559 U.S. 356 (2010) (counsel's failure to inform a client whether his plea carries a risk of deportation results in constitutionally deficient assistance of counsel). *Walkes*, 2017 WL 374466, at *2.

asylum, CAT, and withholding of removal and concluded that the Defendant met his burden with respect to prejudice in such regards, the lapse in time and the changes in the law since 2011 forced the Court to engage in a degree of prediction as to what an IJ at a different time would or would not have concluded on discretionary matters. That is all a result of the conduct of the DHS Officers here. Beyond that is the reality that the Defendant's New Jersey conviction was insufficient to warrant expedited Removal Proceedings in the first place, as that conviction is insufficient to make the Defendant an "aggravated felon" under federal law. All of this is compounded by the "sufficiently flagrant" deprivation of rights which occurred here, which alone is sufficient to presume prejudice in this case. *Walkes*, 2017 WL 374466.

"An error is fundamental if it undermines confidence in the integrity of the criminal proceeding." *Young v. United States*, 481 U.S. 787, 810 (1987). While the 2011 Removal Proceeding was not criminal in nature, "liberty itself may be at stake in such matters." *Id.*; *see also Dimaya*, 138 S. Ct. at 1209 ("[D]eportation is a particularly severe penalty, which may be of greater concern to a convicted alien than any potential jail sentence."). Therefore, even if the Defendant was unable to show prejudice by demonstrating that he had a reasonable likelihood of success on his asylum, CAT, or withholding arguments, such prejudice must be presumed in this case, given the gravity of what happened at the 2011 Removal. The Defendant satisfies the third element of § 1326(d).[53]

## C. Disposition of Defendant's Motion to Dismiss

The Defendant has satisfied the three elements of § 1326(d) to collaterally attack the 2011 Removal Order. Therefore, the Defendant's Motion to Dismiss Indictment is granted on the merits.

---

[53] Of course, the Attorney General's 2018 decision in *Matter of A-B-* has no impact on this portion of the Court's Opinion in this case.

## III.    Defendant's Motion for Release on Bond

The Defendant's Motion for Release on Bond, ECF No. 36, is denied as moot in light of the Court's dismissal of the Indictment.

## IV.    Government's Motion to Dismiss

Three months after the Defendant filed his Motion to Dismiss, the Government filed its own Motion to Dismiss Indictment, ECF No. 46. The Government was willing to dismiss its own Indictment with prejudice, but it would not consent to the Court's granting of the Defendant's Motion to Dismiss. (Tr. of Proceedings, ECF No. 57, 6:18–24, 30:5–7.) The difference between the "cross" Motions to Dismiss Indictment is that the Defendant's Motion to Dismiss, now granted, attacks the validity of the underlying 2011 Removal Proceeding. The ultimate effect of granting the Defendant's Motion to Dismiss on its merits on any future removal proceedings against the Defendant is uncertain, as that issue in the first instance is for an immigration court (and perhaps ultimately the Court of Appeals). But without an adjudication of the Defendant's Motion (or the Government's concession to it), the conduct and result of the 2011 Removal Proceeding would be shielded from public examination, notwithstanding that the Government relied on that very Removal Proceeding in seeking the Defendant's Indictment. This is important since, as the Government conceded at the hearings in this case, the United States could (and may well) simply now seek to rely on the 2011 Removal Process, the fatally flawed Forms, and the resulting 2011 Removal Order in this case in future removal proceedings. (ECF No. 77, 37:23–38:12.)

In light of the Court's granting of the Defendant's Motion to Dismiss because the Defendant has successfully collaterally attacked the 2011 Removal, and in light of the facts brought before the Court by the Government itself, the Government's Motion to Dismiss is denied.

Recognizing that it is unusual for a court to deny the Government's motion to dismiss an indictment that the Government sought in the first place, the Court further explains its reasoning.

## A. Fed. R. Crim. P. 48(a)

The Government seeks dismissal of its own Indictment because "the United States has determined that dismissal . . . is in the interests of justice."[54] (Gov't's Mot. to Dismiss Indictment, ECF No. 46, at 1.) The Federal Rules of Criminal Procedure provide that "[t]he government may, *with leave of court*, dismiss an indictment, information, or complaint." Fed. R. Crim. P. 48(a) (emphasis added). But courts do not have "unfettered discretion" to deny such motions. *In re Richards*, 213 F.3d 773, 777 (3d Cir. 2000).

The Third Circuit's standard for when a court may refuse to dismiss an indictment under Rule 48(a) is that a court is to grant a government Rule 48(a) motion to dismiss unless such dismissal is "clearly contrary to manifest public interest." *Id.* at 787. Courts have acknowledged "that refusal to dismiss is appropriate only in the rarest of cases." *Id.* at 786. This standard functions to prevent a court from routinely substituting its judgment for that of the prosecutor. *Id.* at 788. After all, our Constitution places the principal power to prosecute in the Executive Branch, not the Judicial Branch. *See In re United States*, 345 F.3d 450, 453 (7th Cir. 2003) (granting a government's petition for mandamus following a district court's denial of a government's motion to dismiss an indictment where the defendant agreed to the government's motion to dismiss).

---

[54] But despite some substantial digging by the Court on the record, the Government never came out and said what those "interests" were, other than asserting that there was a "litigation risk" without articulating what the risk was (*see* ECF No. 57, 32:8–36:21), along with the avoidance of the expenditure of additional Government time and resources on this prosecution. (Gov't's Resp. Br. in Supp. of Gov't's Mot. to Dismiss, ECF No. 66, at 9.) The risk that the Government may not prevail, or that it would have to expend further litigation resources, are not in the Court's estimation "interests of justice," but are instead the interests of the Department of Justice were it considered to be in the position of an ordinary litigant. But, of course, it is not. *Berger v. United States*, 295 U.S. 78, 88 (1935).

But our Court of Appeals has also stated that a district judge "has independent responsibilities" to protect certain rights, interests, and duties. *In re Richards*, 213 F.3d at 788. While Rule 48(a) should rarely be used to bar dismissal, a district court's role in considering a Rule 48(a) motion is not that of a rubber stamp. *Id.* The district court's exercise of its judgment, as set out in *In re Richards*, takes two forms. First, it protects a defendant from harassment such as repeated prosecution and also protects judicial processes from abuse. *Id.*; *see Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977) (per curiam). Second, "the public has a generalized interest in the processes through which prosecutors make decisions about whom to prosecute that a court can serve by inquiring into the reasons for a requested dismissal." *Id.* at 789. "Bringing these decisions into the open may, in turn, lead to attempts by the public to influence these decisions through democratic channels." *Id.*

## B. **Application of Rule 48(a)**

This is not a case where the Court is refusing to dismiss the case. The case will be dismissed. But it will be dismissed on the merits, as explained above, pursuant to the Defendant's Motion to Dismiss. Such a result balances the principles of *In re Richards* as it serves to limit this Defendant's exposure to future prosecutorial efforts reliant on the invalid 2011 Removal without offending the role of the Executive Branch's exercise of prosecutorial discretion and does not constitute a refusal to dismiss. In reaching this result, the Court concludes as follows.

With respect to risk of prosecutorial harassment as that term is used in this context,[55] given that further immigration proceedings (Removal Proceedings) against the Defendant lie at least

---

[55] In this Court's judgment, this does not require a showing of a malicious prosecutorial motive, but is instead focused on the repeated use of prosecutorial authority in a manner that offends, for instance, core due process interests.

initially in non-Article III tribunals or processes under the authority of the Department of Justice,[56] a dismissal with prejudice on the Government's Motion to Dismiss is insufficient to address the real risk to this Defendant of further prosecutorial actions at the behest of, or in conjunction with, the Department of Justice, reliant on the 2011 Removal. That is important here because prior to the Defendant's Indictment in this case, on October 3, 2017, DHS issued a "Notice of Intent/Decision to Reinstate Prior Order," which provided notice of the Secretary of Homeland Security's intent to reinstate the 2011 Removal Order. (Def.'s App. 1.) Despite what has surfaced in this case before this Court, the Government (which its lawyers assert in this Court is really only the Department of Justice and no one else) has steadfastly refused to provide any assurance that the Forms, and the 2011 Removal Proceeding, will not be relied upon in future proceedings against the Defendant, and the Court may therefore conclude that they will be. (ECF No. 77, 37:23–38:12.) And the Court may fairly conclude (and does) that a principal motivation for the Government's dismissal motion is the avoidance of an adjudication relative to the validity of the process used to engineer the 2011 Removal.[57] This all brings this case squarely within the principles of *Rinaldi*, which concluded that a Rule 48(a) dismissal should not be granted when there is a taint of

---

[56] The Office of the Chief Immigration Judge and the appellate body, the Board of Immigration Appeals, are organized within the Office for Immigration Review, an agency of the Department of Justice, and the Attorney General is responsible for appointing the Chief Immigration Judge and the members of the Board of Immigration Appeals. 8 C.F.R. §§ 1003.1, .9.

[57] "Reinstatement orders do not exist independent and separate from their prior orders of removal but are instead explicitly premised on the prior order." *Charleswell*, 456 F.3d at 352. Pursuant to 8 U.S.C. § 1231(a)(5), when a prior order of removal is reinstated, the prior order of removal is not "subject to being reopened or reviewed" at the administrative immigration level. However, of consequence here is the fact that any such reinstatement order is subject to judicial review by our Court of Appeals, which specifically includes an examination of whether the original removal order was invalidated. *Ponta-Garcia v. Attorney Gen. of U.S.*, 557 F.3d 158, 163 (3d Cir. 2009) ("While [§ 1231(a)(5)] prohibits relitigation of the merits of the original order of removal, it does not prohibit an examination of whether the original order was invalidated . . . ."). In so holding, our Court of Appeals directly referenced the decision of the First Circuit in *Ponta-Garc[iJa v. Ashcroft*, 386 F.3d 341 (1st Cir. 2004), which observed that the administrative reinstatement of a removal order that had been invalidated by a federal district court would be "problematic." *Id.* at 343. The long and the short of it is that a determination as to the validity of the 2011 Removal may be a matter of substantial consequence in regard to future proceedings involving the Defendant.

impropriety related to the effort to dismiss. 434 U.S. at 30. And here, there is the undeniable possibility (if not probability) that the Forms and the 2011 Removal Order will be reused, front and center, in a future proceeding conducted under the auspices of the Department of Justice. Thus, in the Court's estimation, this risk of recycling the 2011 Removal and the Forms in future proceedings (including those managed by the Department of Justice's immigration enforcement/adjudication processes) demonstrates that granting dismissal only pursuant to the Government's Motion to Dismiss would be clearly contrary to the "manifest public interest" in the integrity of our Nation's legal processes. *Id.*

The Department of Justice has also made it crystal clear that it will take no action to ensure a lawful future Removal Proceeding against the Defendant to the extent it involves another Executive Department. The Department of Justice, here, downplays its role in immigration matters or its relationship to future applications of the 2011 Removal Proceeding by invoking what it says is in effect a bureaucratic wall within the Executive Branch. While the Department of Justice has decided that it will seemingly not pursue the Defendant further on this criminal charge in this Court, its lawyers, lawyers for the *United States*, have declined to affirmatively disclaim that the federal Executive Branch won't continue to fully rely on the Forms or the 2011 Removal in any upcoming Removal (or other) proceedings as to the Defendant—Forms and a process which the Court has described as "wholly unlawful." (Tr. of Proceedings, ECF No. 77, 53:4.)

For the Department of Justice to seek to treat our Nation's immigration legal system as somehow distinct and detached from that Department's critical role in it bypasses well-established law. First, as a general matter, the Attorney General takes the reins in all litigation to which the United States or an agency is a party—his is the voice of the United States in a case before this Court. *See* 28 U.S.C. § 519 ("Attorney General shall supervise all litigation to which the United

States, an agency, or officer thereof is a party . . . ."); *see also* 28 U.S.C. § 516 ("Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, . . . is reserved to officers of the Department of Justice, under the direction of the Attorney General.") And in this case, as explained above, the Assistant *United States* Attorney appeared at every hearing and every oral argument in this case, buttressed by the presence of DHS Officers.

The Attorney General and the Department of Justice of course play leading roles in the determination of immigration matters.[58] The Government seemingly contends that the Department of Justice is some sort of stranger to the important work of formulating federal immigration policy and leading its enforcement.[59] But for this Court to so conclude would "tax[ ] the credulity of the credulous." *Maryland v. King*, 569 U.S. 435, 466 (2013) (Scalia, J., dissenting). As former Attorney General Alberto Gonzales and Department of Justice Senior Litigation Counsel for the Office of Immigration Litigation Patrick Glen recently explained, "the Department of Justice [has] final say in adjudicat[ing] matters of immigration policy . . . ."[60] *See* 8 U.S.C. § 1103(a), (g) (providing Attorney General determinative role as to legal issues relative to administration of immigration policy).

---

[58] Simply by way of example, according to the Department of Justice, its Executive Office for Immigration Review "administers the Nation's immigration court system" and "decides whether [a charged] individual is removable from the country." U.S. Dep't of Justice, *Executive Office for Immigration Review: An Agency Guide* (2017), https://www.justice.gov/eoir/page/file/eoir_an_agency_guide/download.

[59] The "Attorney General enjoys broad powers with respect to 'the administration and enforcement of [the INA itself] and all other laws relating to the immigration and naturalization of aliens.'" *Matter of A-B-*, 27 I. & N. Dec. at 323 (quoting *Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 279 (4th Cir. 2004)).

[60] Hon. Alberto R. Gonzales & Patrick Glen, *Advancing Executive Branch Immigration Policy Through the Attorney General's Review Authority*, 101 Iowa L. Rev. 841, 847 (2016).

The Attorney General also has far-reaching powers to himself decide specific immigration cases with his powerful referral authority under 8 C.F.R. § 1003.1(h)(1)(i) (2015), and the exercise of that power results in precedential that shape immigration law.[61] *See, e.g.*, *Matter of A-B-*, 27 I. & N. Dec. at 323 ("The extraordinary and pervasive role that the Attorney General plays in immigration matters is virtually unique.").[62] It has been aptly observed that, "[i]t is the Attorney General who was statutorily charged, and remains charged together with the Secretary of the [DHS], with the administration and enforcement of the immigration laws."[63]

Given these realities, it is simply incorrect for the Government's lawyers to advise this Court that they are in no position to speak on behalf of the United States as to the future conduct of this immigration case. As explained above, the 2011 Removal Proceedings as they were carried out against the Defendant were a hollow facsimile of the due process bedrock of our Nation's legal system. This is reason enough to convince the Court that resolving the case on the Government's Motion to Dismiss alone risks very real prejudice to the Defendant stemming from further legal action against the Defendant based on the Forms and the 2011 Removal. Thus, it is necessary for this Court to use its "inherent authority to ensure that *its* processes are not being abused" by actually adjudicating the Defendant's Motion to Dismiss, which collaterally attacks the validity of his 2011 Removal Order, as opposed to dismissing the case without such an adjudication. *In re Richards*, 213 F.3d at 788 (emphasis added).

With respect to prosecutorial discretion, concerns about the judiciary's intrusion into such discretion are not an issue here. The effect of denying a prosecutor's motion to dismiss an

---

[61] *Id.* at 857 (citing *Miranda Alvarado v. Gonzales*, 449 F.3d 915, 921–22 (9th Cir. 2006)).

[62] *See supra* note 40.

[63] *Id.* at 850 (citing 8 U.S.C. § 1103(a), (g) (2012)).

indictment typically results in a conundrum in which the Judicial Branch is forcing the Executive Branch's hand in matters that are nearly exclusively within the Executive's power. *See In re United States*, 345 F.3d at 453–54. That is not the case here. The issue before the Court on these cross Motions is not whether this case would be dismissed. It certainly will be. The issue facing the Court is whether the case is to be dismissed pursuant to the Defendant's Motion or the Government's.

The Court is also unconvinced that granting the Government's bald Motion to Dismiss would serve "either the public interest in the fair administration of criminal justice or [act] to preserve the integrity of the courts." *United States v. Omni Consortium*, 525 F. Supp. 2d 808, 810 (W.D. Tex. 2007). As noted above, the testimony provided in this Court by the Government's witnesses (who are federal officers) was at best nonsensical and at worst based in some material part on self-serving falsity. Based on the representations of the Government, the Court has no confidence that the 2011 "process" (including the "waivers" allegedly reflected on the Forms) will not simply be recycled and used as the starting point for the Defendant's Removal now, on the premise that the 2011 process had been legitimately conducted. And the Government's dismissal motion did not arrive until it was evident that the 2011 Removal, upon which the Government relied to make its case here, was fatally flawed. Statements by the Government "have significant consequences for the public's perception of judicial proceedings. And activity that threatens the perception of fairness in those proceedings undermines faith in our system of justice." *United States v. Kpodi*, No. 17-3008, 2018 U.S. App. LEXIS 10720, at *15 (D.C. Cir. Apr. 27, 2018). As this Court has concluded, the Defendant was upon Indictment forced to litigate (now successfully) a collateral attack on the validity of his removal under § 1326(d), and the invalidity of that proceeding has been demonstrated. It is not "whether the decision to maintain the federal

59

prosecution was made in bad faith" that guides this Court's decision to deny the Government's Motion to Dismiss. *Rinaldi*, 434 U.S. at 30. It is instead the Government's efforts to now terminate this prosecution at this "cross Motion to Dismiss" stage without any adjudication on the merits of the § 1326(d) defense that the Court concludes necessitates this outcome. *Id.* It simply is not in the public interest to permit the Government to now avoid such adjudication because it was required to confront the reality of the evidence it had advanced.

Beyond that is the reality that although the Government has formally advised the Court that it does not adopt nor rely on its own witnesses' testimony in this Court, the Government nevertheless has not affirmatively disavowed it. The factual findings and resulting conclusions in this Opinion should not be surprising. The Court went to great lengths to lay out what it viewed as the apparent fallacies, inconsistencies, and inaccuracies of the Officers' testimony during the course of the hearings in this case. After learning that the Government would not rely on that testimony, the Court asked the Government (at the final hearing in this case) if the Court should believe the Officers' testimony. The Government's lawyer responded, "Your Honor, you should give it as much weight as you see fit." (Tr. of Proceedings, ECF No. 77, 27:21–22.) Thus, the Government neither vouches for the testimony of the federal agents it called as witnesses nor does it acknowledge the facial flaws in it.

Of course, our Court of Appeals has rejected the principle of the Government taking such a noncommittal position as to the credibility of its own witnesses:

> We do not believe, however, that the prosecution's duty to disclose false testimony by one of its witnesses is to be narrowly and technically limited to those situations where the prosecutor knows that the witness is guilty of the crime of perjury. Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. This is not to say that the prosecutor must play the role of defense counsel, and ferret out ambiguities in his witness' responses on cross-examination. **However, when it should be obvious to**

> **the Government that the witness' answer, although made in good faith, is untrue, the Government's obligation to correct that statement is as compelling as it is in a situation where the Government knows that the witness is intentionally committing perjury.**

*United States v. Harris*, 498 F.2d 1164, 1169 (3d Cir. 1974) (emphasis added). The Government's non-position as to the credibility of the testimony of the only witnesses it called in support of this prosecution gives the Court no basis to conclude that the Government will not re-use the 2011 Removal against the Defendant at the next opportunity if its validity is not adjudicated one way or the other, here and now.

As a final note, the timing of the cross Motions to Dismiss is also not the issue here. While it is true that the Government's Motion to Dismiss became fully briefed a few weeks before the Defendant's previously filed Motion to Dismiss was fully briefed, the delay in the briefing schedule for the Defendant's Motion to Dismiss was a direct result of the timing of the Government's production of documents to the Defendant. It also bears noting that the most telling physical evidence that the Forms were invalid stems from the *color* copies of the Forms, which were not produced to the Defendants until March 12, 2018, two months after the Defendant filed its Motion to Dismiss and over four months after the Government filed its Indictment. (Receipt for Local Rule 16.1 Material Suppl., ECF No. 61.) Asylum-related documents key to the Defendant's case regarding prejudice were also not provided until March 12, 2018. (Receipts for Local Rule 16.1 Material Suppl., ECF Nos. 59, 60, 61, 62.) In fact, this Court modified the briefing schedule on Defendant's Motion to Dismiss five (5) times to allow sufficient time for the Government to produce necessary and previously requested documents to the Defendant. (Orders, ECF Nos. 30, 33, 35, 39, 51.) Further adding to this delay, after the fourth extension, the Government instructed DHS to cease document production and redaction when it filed its own Motion to Dismiss. (*See* Tr. of Proceedings, ECF No. 58, 79:14–79:20.)

It struck the Court as appropriate to wait until the briefing of the previously filed Defendant's Motion had been completed before ruling on the cross Motions to Dismiss. Indeed, the Government reported to this Court *after* it filed its own Motion to Dismiss that it still was "interested in providing supplemental briefing" on the issue of prejudice as it pertained to the Defendant's Motion to Dismiss. (Tr. of Proceedings, ECF No. 57, 30:20–31:1.) Allowing the Defendant's Motion to Dismiss to complete its briefing schedule and for the Court to rule on the Motions at the same time was both necessary and appropriate to the Court's obligations to fully consider the Government's stated reasons for its dismissal motion, in light of the testimony of the DHS Officers during these proceedings.

## C. **The Government's Motion to Dismiss Indictment is Denied**

The Government's Motion to Dismiss is denied. "Procedural fairness and regularity are of the indispensable essence of liberty." *Mounts v. Boles*, 326 F.2d 186, 188 (4th Cir. 1963) (quoting *Shaughnessy*, 345 U.S. at 224 (Black, J., dissenting)). Whether the Defendant will be subject to new proceedings aimed at now effectuating his removal from the United States in conformity with the law is a matter in the next instance for the administrative immigration process, with judicial review of those proceedings at the United States Court of Appeals. But it is this Court's obligation to rule on the competing dismissal motions on the record that is now before it. As "justice must satisfy the appearance of justice," *Offutt v. United States*, 348 U.S. 11, 14 (1954), this Court concludes that the facts and the law direct that this case be dismissed on the merits, and not based simply on the post-Indictment, post-testimony exercise of the Government's prosecution prerogatives.

## V.    **Conclusion**

For these reasons, the Defendant's Motion to Dismiss Indictment, ECF No. 14, is granted. The Defendant's Motion for Bond, ECF No. 36, is denied without prejudice as moot. The Government's Motion to Dismiss Indictment, ECF No. 46, is denied.

An appropriate Order will issue.

Mark R. Hornak
United States District Judge

cc: All counsel of record