# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,     )
                                      )
                                      )    2:17-cr-292
           v.                    )
                                      )
MARIO NELSON REYES-ROMERO,     )
                                      )
         Defendant.

## OPINION

**Mark R. Hornak, Chief United States District Judge.**

From time to time, a court is compelled to render a decision that was completely avoidable by at least one party and, in doing so, must place on the public record conclusions as to the actions of that party that are both disturbing and uncharacteristic of that party's course of conduct in other settings. This is just such a decision, involving the exercise of the federal government's power to investigate, bring, and pursue criminal prosecutions.

The Government, in its capacity as prosecutor, "may prosecute with earnestness and vigor—indeed, [it] should do so. But, while [it] may strike hard blows, [it] is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935).[1] This Opinion addresses an award of attorney's fees under the Hyde Amendment, which is one avenue of relief available to individuals after just such a prejudicial detour from the fair administration of justice by the two Executive Departments of the federal government involved here.

\*\*\*

---

[1] "The prosecutor has more control over life, liberty, and reputation than any other person in America. His discretion is tremendous. . . . This authority has been granted by people who really wanted the right thing done—wanted crime eliminated—but also wanted the best in our American traditions preserved." Robert H. Jackson, Attorney General, Address to the Second Annual Conference of United States Attorneys: The Federal Prosecutor (Apr. 1, 1940).

Mr. Mario Nelson Reyes-Romero ("Reyes-Romero") seeks an award of attorney's fees and expenses pursuant to the Hyde Amendment, 18 U.S.C. § 3006A (statutory note), Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997), claiming that the Government's[2] criminal prosecution against him was vexatious, frivolous, and/or in bad faith. Reyes-Romero filed the pending Application for Award of Attorney's Fees and Litigation Costs ("Fee Application") on August 7, 2018. (Fee Application, ECF No. 94.) Both parties submitted briefs (ECF Nos. 95, 105, 106), and the Court held an Oral Argument.[3] (ECF No. 111.) Reyes-Romero's Fee Application is granted to the extent that the Court will award attorney's fees and litigation costs to Reyes-Romero, the final amount of which will be determined in further proceedings.

## I.    Factual Background

On October 24, 2017, Reyes-Romero was indicted in this District on one (1) count of Reentry of Removed Alien, 8 U.S.C. § 1326. (Indictment, ECF No. 1.) The Indictment stated that Reyes-Romero had been previously removed from the United States in 2011[4] pursuant to law ("2011 Removal") and later knowingly and unlawfully reentered the United States. (*Id.*)

On November 17, 2017, Reyes-Romero filed a motion to dismiss the Indictment and asserted the affirmative defense set out in § 1326(d),[5] which allows for a collateral attack on the

---

[2] Unless otherwise referenced with particularity, the term "Government" and "DOJ" are used interchangeably to refer to the United States Department of Justice.

[3] The Government advised the Court at the Oral Argument on the Fee Application that the Department of Homeland Security (DHS) was given notice of Reyes-Romero's Fee Application.

[4] In 2011, DHS commenced an administrative removal proceeding against Reyes-Romero pursuant to 8 U.S.C. § 1228, which authorizes the expedited removal of aliens convicted of "aggravated felonies" as that term is defined under federal law. (Op., ECF No. 92, at 2.)

[5] A defendant charged with reentry of removed alien under § 1326 may collaterally attack the underlying removal order if the defendant establishes that:

2

validity of the underlying removal order (in this case, the Removal Order resulting from the 2011 Removal Proceedings). (Reyes-Romero's Mot. to Dismiss, ECF No. 14.) The parties briefed the issues in Reyes-Romero's motion to dismiss extensively, and the Court conducted a two-day hearing and oral argument.[6] The parties were also permitted to file post-hearing briefs. (Order, ECF No. 27.)

Then, on February 27, 2018, the Government filed its own motion to dismiss the Indictment with prejudice (Gov't's Mot. to Dismiss, ECF No. 46), but also refused to consent to or to not oppose the bare granting of Reyes-Romero's motion to dismiss. Ultimately, the Court issued an Opinion and accompanying Order, dated July 2, 2018, granting Reyes-Romero's motion to dismiss, holding that the underlying 2011 Removal Order was wholly contrary to law, and ordering the dismissal of the Indictment with prejudice. (Op., ECF No. 92, available at 327 F. Supp. 3d 855 (W.D. Pa. 2018); Order, ECF No. 93.) In the same Opinion, the Court denied the Government's motion to dismiss, concluding that the Government's motion to dismiss was "principally motivated" by a desire to avoid an adjudication on the validity of Reyes-Romero's 2011 Removal so as to expedite further proceedings against him, and that it was in the interests of justice for the Court to adjudicate and grant Reyes-Romero's motion to dismiss to avoid prosecutorial harassment of Reyes-Romero. (Op. at 51–62.) The Government did not appeal that July 2, 2018, Order, rendering the Court's findings and conclusions in that July 2, 2018, Opinion and Order final.

---

(1) the defendant exhausted any administrative remedies that may have been available;
(2) the deportation proceedings from which the underlying removal order was issued improperly deprived the alien of the opportunity to obtain judicial review; and
(3) the entry of the removal order was "fundamentally unfair."

8 U.S.C. § 1326(d); *United States v. Charleswell*, 456 F.3d 347, 351 (3d Cir. 2006).

[6] The parties pre-hearing briefs are on the docket at ECF Nos. 14, 15, 16, 17, 19. The Court held the two-day proceeding on January 3 and 4, 2018. (ECF Nos. 23, 26.)

Reyes-Romero now seeks an award of attorney's fees and litigation costs, arguing that the position of the United States in this criminal case was vexatious, frivolous and/or in bad faith. Given the "scienter" requirements squarely at issue here, the Court must, regrettably, begin by again summarizing the record as it relates to the evidence advanced and positions taken by the United States in this criminal proceeding, largely repeating its now-final findings and conclusions from the July 2, 2018, Opinion, as to the conduct of the Government in this case.[7]

## A. The Indictment is Filed and Reyes-Romero Files His Motion to Dismiss

A month after the Government filed its Indictment charging Reyes-Romero with Reentry of Removed Alien, Reyes-Romero filed his motion to dismiss pursuant to § 1326(d). (ECF No. 14.) Reyes-Romero's motion to dismiss attacked the validity of the 2011 Removal Order on the basis that it was premised on unintelligent waivers of his rights that he executed during his 2011 Removal proceedings.[8] To support this argument that his alleged "waivers" were invalid, Reyes-Romero attached two black-and-white copies of the DHS forms that were completed during his 2011 Removal Proceeding—DHS Form I-826 and DHS Form I-851 (the "Forms")—as part of the appendix to his brief in support of his motion to dismiss the Indictment ("Appendix"). (Op., at 2; *see also* App. 22–23, 106, ECF No. 16.)[9]

---

[7] Unlike the background section in this Court's July 2, 2018, Opinion, the background section here lays out the series of events in this case in the order in which they unfolded before the Court, so the reader can better appreciate what happened.

[8] Where the underlying removal proceeding "is so procedurally flawed that it 'effectively eliminated the right of the alien to obtain judicial review,' we may invalidate the criminal charges stemming therefrom." *Charleswell*, 456 F.3d at 352 (quoting *United States v. Mendoza-Lopez*, 481 U.S. 828, 839 (1987)). Congress codified this affirmative defense in § 1326(d).

[9] A black-and-white copy of the completed I-826 is attached to this Opinion as Exhibit A. A black-and-white copy of the completed I-851 is attached to this Opinion as Exhibit B. A color copy of the completed I-826 is attached to this Opinion as Exhibit C. A color copy of the completed I-851

The first Form at issue, the I-826, is titled, "Notice of Rights and Request for Disposition." (Ex. A.) The I-826 informed Reyes-Romero that he had a right to a hearing before an Immigration Judge to determine whether he may remain in the United States, and provided three options: request a hearing, declare fear of returning to the home country, or admit illegal status and surrender rights to a hearing. (*Id.*) The black-and-white copy of Reyes-Romero's completed I-826 shows that Reyes-Romero supposedly selected two wholly irreconcilable options: he both requested a hearing and surrendered his rights to a hearing. (*Id.*) The I-826 indicates a date and time of service of June 23, 2011, 9:00. (*Id.*)

The second Form at issue, the I-851, is a two-page document titled, "Notice of Intent to Issue a Final Administrative Removal Order." (Ex. B.) The first page contains information about Reyes-Romero with a charge indicating that Reyes-Romero is deportable based on his conviction of an aggravated felony and stating that DHS was serving such notice "without a hearing before an Immigration Judge" but stating that Reyes-Romero could rebut the charges stated on the Form. At the bottom of the first page of the I-851, there is a signature line for "Signature and Title of Issuing Officer." (*Id.*) That line contains a signature by the "Issuing Officer" and bears a date and time notation of June 23, 2011, at 10:00. (*Id.*)

The first section at the top of the second page of the I-851 is the "Certificate of Service," which displays Reyes-Romero's signature and a date and time notation of June 23, 2011, 9:20. (Ex. B.) Thus, the Form was signed by the Issuing Officer and "issued" forty (40) minutes *after*

is attached to this Opinion as Exhibit D. As the Court did in its July 2, 2018, Opinion, the Court has partially redacted the DHS Officers' signatures from the copies of the Forms attached to this Opinion because the publication of complete signatures could pose an identity theft issue to those involved. The appearance of those signatures is not germane to the issues here. The Court has also redacted other non-germane identifying information on the copies of the Forms, including addresses and DHS internal identification numbers.

receipt was purportedly acknowledged by Reyes-Romero at 9:20 AM that day. (Op. at 9.) The middle section of the second page, where Reyes-Romero would have contested removal or sought withholding of removal, is blank. (Ex. B.) The final section has three boxes checked, corresponding with the following selections: (1) expressing no desire to contest and/or to request withholding of removal, (2) admitting the allegations and charges contained in the Form and acknowledging ineligibility for any form of relief from removal, and (3) waiving the right to apply for judicial review. (*Id.*) Below these three selections is Reyes-Romero's signature, with a date and time of June 23, 2011, 9:00 written in that section, twenty (20) minutes before the time noted next to Reyes-Romero's signature in the "Certificate of Service" section. (*Id.*) It is "witnessed" by the interpreter and DHS "serving" Officer, Jose Alicea, with the very same date and time notation. (*Id.*)

At the time that Reyes-Romero had filed his motion to dismiss and attached the Forms, it was crystal clear to anyone who looked at the black-and-white copies of the I-826 and I-851 that the following events were recorded as transpiring in the 2011 Removal proceeding: Reyes-Romero supposedly waived his rights to contest removal or apply for judicial review on the I-851 twenty (20) minutes *before* he acknowledged receipt of the I-851 and an hour before it was ever "issued." (Op. at 10–11.) He supposedly waived those hearing rights (using check marks on the I-851) at the exact moment that he was served with the I-826, where he had also affirmatively indicated his request for a hearing (using X marks). (*Id.*) With respect to the different markings attributable to Reyes-Romero, the markings switched from Form to Form yet key ones (check marks) matched other markings attributed to the Officers on each such Form. (*Id.*; Exs. A, B.)

Despite the inherent inconsistency as to Reyes-Romero's desire for a hearing that was plain from the face of the Forms, the Government responded to Reyes-Romero's motion to dismiss by

6

arguing that he "knowingly and intelligently waived his right to contest the 2011 Immigration proceedings in the Form I-851 waiver." (ECF No. 17, at 7.) The Government argued that the I-851 represented a valid and completed waiver and that Reyes-Romero's dual-selection on the I-826 made the I-826 "internally inconsistent at best" but still insufficient to show that his waivers were not knowing and voluntary. (*Id.* at 8.) As later events would demonstrate, that position of the DOJ was unsupportable.

The Court scheduled a hearing and oral argument on Reyes-Romero's motion to dismiss. The first day of that hearing, January 3, 2018, dealt exclusively with the issue of whether Reyes-Romero had knowingly and intelligently waived his rights to challenge his removal when he signed the Forms. (*See* Tr. of Proceedings on Jan. 3, 2018, ECF No. 30.) The Government began its presentation by calling two witnesses, the DHS Officers whose names and signatures appear on the Forms, Officers Trushant Darji and Jose Alicea. (*Id.*)

*Both* DHS Officers presented testimony that "was, at key points, internally inconsistent, contradictory in comparison with the content of the Forms, and simply nonsensical." (Op. at 11.) For example, Officer Trushant Darji testified that if a detainee selects multiple options as to requesting a hearing and declining a hearing, a DHS Officer would "absolutely" attempt to clarify the alien's desires before other forms were filled out, including by having the detainee initial his "real" choice, even though he clearly did not do so as to Reyes-Romero's I-826. (*Id.* at 12.) Officer Darji initially testified that he served all forms together at the same time upon a detainee, only to then change his testimony moments later claiming he normally serves the "rights form" (the I-826) first, even though the time stamps on Reyes-Romero's Forms indicate he supposedly was presented with them (and signed them) at the exact same time. (*Id.*) Officer Darji also flip-flopped his testimony with respect to when his supervisor would sign off on the issuance of the I-851, i.e.

whether that was before the documents were to be served on a detainee or after they were served upon and completed by the detainee, despite his explaining that the I-851 states that the issuing signature "authorize[s] you to approach the alien with this document." (*Id.* at 12–13.) After a recess, Officer Darji reversed course on the purpose of the "issuing signature" as well, in order to make it align with his testimony that the issuing signature was to be completed *after* the document was served. (*Id.* at 13.) When the Court asked Officer Darji why he gave opposite answers, Officer Darji responded that "[t]hinking about it after I answered the first time, the second answer was more appropriate." (*Id.*) This response required the Court to follow-up with, "[w]hich answer was true?" (*Id.*)

Similar inconsistencies arose when Officer Darji was asked to explain why the I-851's certificate of service would be completed only after a detainee waived his rights, in which Officer Darji testified that waivers were signed before there was a required explanation and confirmation of understanding. (*Id.* at 14.) At the end of both the Government's and Reyes-Romero's examination of Officer Darji, the Court asked the witness the following question:

> **THE COURT**: Okay. But in the circumstance where it is a form 851 that is going to be used, in this specific circumstance, am I reading these forms inaccurately -- or actually am I reading them accurately that within moments of 9 o'clock in the morning on June 23rd, 2011, several things had occurred pretty much all at once. This defendant was told he had a right to request a hearing. He requested a hearing. He said he didn't want a hearing. And he was told he couldn't have a hearing. Am I reading those forms correctly, sir?
>
> **THE WITNESS**: Yes.
>
> **THE COURT**: Does that make any sense at all to you, sir?
>
> **THE WITNESS**: No, Your Honor.

(Op. at 22; *see also* ECF No. 30, at 61:21–62:14.) At this point in the hearing, the Court recessed to allow everyone to "reflect on what we have heard so far." (ECF No. 30, at 63:13–16.)

Following the recess, the Government pressed on, calling its next witness. Officer Alicea's testimony was no better in terms of coherency or credibility. (*See* Op. at 14–19.) He testified that he was commonly involved in these types of removal proceedings, so he did not have a specific recollection of Reyes-Romero's removal proceeding. (*Id.* at 15.) In the same direct examination, he testified these proceedings were actually rare and he could not recall any other administrative proceeding similar to Reyes-Romero's. (*Id.*) He testified that Officers are to serve one Form at a time and then go on to the next, which, based on identical time stamps on both Forms, did not happen in Reyes-Romero's case. (*Id.*; ECF No. 30, at 89:2–17.) Officer Alicea testified that Reyes-Romero was read his rights in Spanish (he does not speak English and the Forms were printed in English only) only *after* he purportedly waived his rights.[10] (Op. at 15.)

At the continuation of the hearing the following day, Reyes-Romero asked the Court to make findings that the waivers were invalid in order to narrow the issues in dispute to solely the last prong of the § 1326(d) test, prejudice. (Tr. of Proceedings on January 4, 2018, ECF No. 31, at

---

[10] Specifically, Officer Alicea was asked why the time stamp associated with the waiver selection on the I-851 shows 9:00 AM yet the "Certificate of Service" section on the very same I-851 page bears a time stamp of 9:20 AM. (ECF No. 30, at 90:21–91:6.) Officer Alicea testified that the twenty minutes *after* Reyes-Romero waived his right "to contest and/or request withholding of removal" (Ex. B, at 2), "would have been about the time my explanation was completed." (ECF No. 30, at 91:7–8.) The Government then confirmed that "during those twenty minutes [after Reyes-Romero waived away his rights at the bottom of I-851], according to your practice, you would have been reading the document in Spanish to the alien?" (*Id.* at 91:9–11.) Officer Alicea responded, "Yes, sir." (*Id.* at 91:12.) Officer Alicea immediately switched gears and stated that he read the document in Spanish *before* a detainee made any selections (*Id.* at 91:13–19), which, of course, then leaves the question of what happened in the twenty minutes between Reyes-Romero waiving his rights on the I-851 and later acknowledging service of the I-851 unanswered.

This is but one of the inconsistencies, implausibilities, and falsehoods in both Officers' testimonies. For a more detailed description, see the July 2, 2018, Opinion, at 11–15.

9

20:21–21:14.) The Government continued to advocate for a finding of a valid waiver. It argued

that the waiver inquiry should focus only on the I-851 and the Court should simply ignore the I-

826 even though that would make it a "legally pointless document." (*Id.* at 24:17–25.)

> [Prosecutor]: Mr. Alicea testified and I believe Officer
> Darji testified as well that the 851 form is the form
> that matters for the administrative removal –
>
> THE COURT: You are saying the agents of the United States
> Department of Homeland Security required this defendant
> and everyone else to go over and to sign a legally
> pointless document, the 826?
>
> [Prosecutor]: That's my understanding of their
> testimony, Your Honor. My understanding is –
>
> THE COURT: Do you think I should believe that?
>
> [Prosecutor]: That's what the agents have testified to,
> Your Honor.
>
> THE COURT: I understand. I heard the words. Do you think
> I should believe their testimony under oath in that
> regard?
>
> [Prosecutor]: I think you should, Your Honor.

(ECF No. 31, at 24:14–25:4.)

Next, in an effort to explain the testimony of the Officers, the Government argued to the

Court that its own understanding of the Officers' testimony was actually that Reyes-Romero placed

his signature on a *blank* waiver section before selecting any waiver option, seemingly akin to

signing a blank check, but that that did not invalidate the waiver. (*Id.* at 30:6–25.) At this point,

the Court asked the first of several questions about the Government's legal positions taken with

respect to the affirmative defense asserted by Reyes-Romero:

> [PROSECUTOR]: Your Honor, my understanding of that
> testimony was that the bottom signature may have
> happened at 9 a.m., but that the checkmarks placed on

the box by Mr. Reyes-Romero would not have happened until
after the –

**THE COURT:** Oh, oh, you are kidding. You are
absolutely kidding, [Prosecutor], if the United States
is arguing that a waiver is valid as to boxes that are
checked after it is signed by the person making the
waiver.
**[PROSECUTOR]:** Your Honor, there is a second signature on
the form toward the top for Mr. Reyes, and that's –

**THE COURT:** The signature at the bottom is the waiver.
You are telling me that before the boxes are checked
indicating the waiver, the waiver section is signed? Is
that what the United States is arguing?

**[PROSECUTOR]:** That is my understanding of the
testimony of the officers, Your Honor.

**THE COURT:** Well, that wasn't my understanding of the
testimony because I might have stopped the hearing right
in its tracks if they testified to that yesterday. I
have got to tell you, [Prosecutor], I find the position
of the United States of America and the Department of
Homeland Security at least intriguing, if not stunning.
We've had two agents of the United States Department of
Homeland Security come in and say that they have this
defendant waive his rights before they were read to him.
Waived his rights as to a charging document before the
charging document was issued. And the United States is
now taking the position that it's a valid waiver when
somebody signs the waiver before the indicia of the
waiver are marked, that is the checkmarks, it's like
signing a blank check. Are you sure that's the argument
of the United States Department of Justice? Justice. Are
you sure that's the argument. . . ?

**[PROSECUTOR]:** Well, Your Honor, if that's – if your
finding is that –

**THE COURT:** I am making no finding. I want to know what
the position of the Attorney General of the United States
represented by you is. That it is a valid waiver of
rights when someone signs the form in blank before the
waiver checkmarks are placed on it; is that the position
of the Attorney General of the United States?

**[PROSECUTOR]**: I would say in this case because there is a second signature toward the top that is dated after the checkmarks are placed, that makes the form valid. That is the position, Your Honor.

(ECF No. 31, at 29:6–30:25.)

The Court then, on January 4, 2018, made tentative findings that there was no voluntary and intelligent waiver by Reyes-Romero in the 2011 Removal Proceeding and that Reyes-Romero would likely prevail on the first two elements and the first prong of the third element of the § 1326(d) affirmative defense, which would leave only the second prong of the third element[11] at issue. (*Id.* at 51:9–52:10.) The remainder of the January 4, 2018, hearing involved Reyes-Romero's witnesses, all family members, testifying about their family's fear of persecution and asylum eligibility.

After this two-day hearing, the Court set an optional post-hearing briefing schedule, that was later extended through March 2018. (Order, ECF No. 27.) However, before that expanded deadline arrived, on February 27, 2018, the Government filed its own motion to dismiss the Indictment (ECF No. 46).

---

[11] The third element of § 1326(d) asks whether the entry of the removal order was "fundamentally unfair." *Charleswell,* 456 F.3d at 359. In order to meet this element, the defendant must establish both (a) that some fundamental error occurred and (b) that as a result of that fundamental error, the defendant suffered prejudice. *Id.* For the second prong, resulting prejudice, defendant must establish (by a preponderance of the evidence) a reasonable likelihood that the result would have been different if the fundamental error in the removal proceeding had not occurred. *Id.* at 361. As noted below, in an egregious case, such prejudice may be presumed. *Id.* at 362 n.17. This Court applied that presumption, in addition to concluding that the Defendant satisfied both prongs of the traditional test, in issuing its now-final Order. (Op. at 51.) The litigation of the third element is referred to throughout the case by the Court and the parties as the "prejudice issue."

## B. The Government Files Its Own Motion to Dismiss the Indictment

The Government filed its motion to dismiss pursuant to Federal Rule of Criminal Procedure 48(a). This Rule provides that "[t]he government may, *with leave of court*, dismiss an indictment, information, or complaint." Fed. R. Crim. P. 48(a) (emphasis added).[12] In its motion to dismiss, the Government articulated that "based on evidence [introduced at the prior hearings] and on additional factual information that has come to the attention of the Government since the hearing[s], the United States has determined that dismissal of the indictment in the above-captioned criminal case is in the interests of justice." (Gov't's Mot. to Dismiss, ECF No. 46, at 1.) Reyes-Romero filed objections to the Government's motion to dismiss, articulating that a simple dismissal of this case, even with prejudice, without a formal adjudication on the merits of his affirmative defense would leave him exposed to possible reinstatement of his 2011 Removal Order in future immigration proceedings. (ECF No. 48.)

Given Reyes-Romero's objections, the Court then held a hearing and oral argument on the Government's motion to dismiss on March 1 and 2, 2018. (ECF Nos. 53, 54.) The Government argued that a trial judge must grant a Government's motion to dismiss absent the existence of improper motives of the prosecutor's office. Given what had transpired at the hearing on Reyes-Romero's motion to dismiss, the Court, once again, reiterated the egregious nature of the conduct

---

[12] A court is to grant a Rule 48(a) motion to dismiss unless such dismissal is "clearly contrary to manifest public interest." *In re Richards*, 213 F.3d 773, 787 (3d Cir. 2000). "[R]efusal to dismiss is appropriate only in the rarest of cases," *id.* at 786, but a district judge "has independent responsibilities" to protect certain rights, interests, and duties. *Id.* at 788. The district court's exercise of its judgment in considering a Rule 48(a) motion, as set out in *In re Richards*, takes two forms. First, it protects a defendant from harassment such as repeated prosecution and also protects judicial processes from abuse. *Id.*; *see Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977) (per curiam). Second, "the public has a generalized interest in the processes through which prosecutors make decisions about whom to prosecute that a court can serve by inquiring into the reasons for a requested dismissal." *In re Richards*, 213 F.3d at 789.

by the DHS Officers—both their conduct in 2011 and their testimony during proceedings in this criminal case—and referenced the relationship between the U.S. Attorney's Office and DHS in the case:

> I think what the testimony of those agents, the portions of it that were true -- because I have concluded that parts of it were not true, they were lies. But what was true demonstrated a level of law enforcement outrageousness I have not seen in any other case since I have been a federal judge. . . . the choice your office has to make is when you are going to decide that you can't continue to rely on that testimony, because under *Napue* and a series of other US Supreme Court cases, your office is not permitted to rely on testimony that's not true. . . . . Because I re-read the testimony last night. It was the single mo[]st troubling thing I have read not only in the time I have been a district judge, but in the time I have been a lawyer. . . . Your colleagues weren't there. But there does come a point where the United States Department of Justice is adopting it.

(ECF No. 58, at 14:20–16:24.) The Government acknowledged the Court's observation but did not disavow the DHS Officers' testimony. (*Id.* at 17:2–6.)

After identifying that there was a plausible risk of harassment to Reyes-Romero in future immigration proceedings and that there was a legitimate public interest in getting to the bottom of what happened in the 2011 Removal Proceeding and then in this proceeding (as articulated by our Court of Appeals in *In re Richards*), the Court pressed the Government as to its reasons for seeking dismissal in the manner in which it had. Here is what the Court learned.

First, under either the Government's or Reyes-Romero's motion to dismiss, the end result for this criminal prosecution would be exactly the same—a dismissal of the Indictment with prejudice. Second, despite the fact that the granting of either motion to dismiss would have an identical impact on the DOJ's ability to criminally prosecute Reyes-Romero for this offense in the future (e.g., end it), the prosecutor would not consent to or agree to not oppose Reyes-Romero's

motion to dismiss because it was "not prepared to stipulate to the prejudice prong" of the § 1326(d) test. (Tr. of Proceedings on March 1, 2018, ECF No. 57, at 30:5–10.) Importantly, neither the Defendant nor the Court ever asked the Government to stipulate to "prejudice," but asked only whether it would "not oppose" the granting of Reyes-Romero's motion to dismiss. (*Id.* at 30:5– 18.) Third, despite the Government's refusal to so stipulate, the Government's stated reason for seeking dismissal of the Indictment was to preserve litigation resources in light of the Government's recent "assessment of its likelihood of success on that [§ 1326(d)] defense." (*Id.* at 36:13–21.) The Government indicated that its "assessment" incorporated certain information discovered in immigration files of Reyes-Romero's family members, which had yet to be turned over to Reyes-Romero. (*Id.* at 32:6–37:14.)

At this juncture in the proceedings, the Government's desire to avoid an adjudication on the merits but to also request a dismissal with prejudice was peculiar, to say the least. Even more peculiarly, despite citing a desire to preserve litigation resources, the Government did not ask that the Court stay the briefing of Reyes-Romero's motion to dismiss (including briefing by the Government) while the Court considered its motion to dismiss. Instead, putting aside its admission that its "likelihood of success" (based on its own assessment) on a § 1326(d) disposition did not justify the further expense of its litigation resources, if Reyes-Romero was to file supplemental briefing on the prejudice issue with respect to his motion to dismiss, the Government wanted to plow ahead and submit its own supplemental briefing. (*Id.* at 30:20–31:1.)

These irreconcilable positions advanced by the Government led the Court to further inquire about what became clear was the real difference between an adjudication on the § 1326(d) affirmative defense and a simple dismissal of the Indictment with prejudice on the Government's motion to dismiss: the effect of the 2011 Removal Order on Reyes-Romero's future immigration

proceedings. What was obvious was that a simple dismissal of the Indictment on the Government's motion to dismiss would leave the 2011 Removal Order intact,[14] but if the Court concluded that the 2011 Removal was contrary to law, DHS likely could not rely upon in it in later proceedings.[15] As this Court recognized, "[t]he long and the short of it is that a determination as to the validity of the 2011 Removal may be a matter of substantial consequence in regard to future proceedings involving the Defendant." (Op. at 55 n.57.)

Despite the constant and obvious collaboration between DHS and DOJ observed by the Court up to and including the current juncture in the case, at the March 1, 2018, hearing, the Government was unable to provide the Court with information about how DHS would choose to proceed in this particular case in light of the dichotomy noted above, ECF No. 57, 7:20–23, 8:10–16, notwithstanding that an ICE Officer was in Court and seated at counsel table. (ECF No. 57, 2:6–8.) Given the lack of answers to the Court's questions and the rarity of an opposed Rule 48(a) motion to dismiss, the Court took the Government's motion to dismiss under advisement. Both parties continued to brief the "cross" motions to dismiss, and the Government finally turned over its immigration files to Reyes-Romero on or about March 12, 2018.[16] (ECF Nos. 59–62.)

---

[14] "That is important here because prior to the Defendant's Indictment in this case, on October 3, 2017, DHS issued a 'Notice of Intent/Decision to Reinstate Prior Order,' which provided notice of the Secretary of Homeland Security's intent to reinstate the 2011 Removal Order." (Op. at 55.) "Pursuant to 8 U.S.C. § 1231(a)(5), when a prior order of removal is reinstated, the prior order of removal is not 'subject to being reopened or reviewed' at the administrative immigration level." (*Id.* at 55 n.57.)

[15] "While [§ 1231(a)(5)] prohibits relitigation of the merits of the original order of removal, it does not prohibit an examination of whether the original order was invalidated . . . ." (Op. at 55 (quoting *Ponta-Garcia v. Attorney Gen. of U.S.*, 557 F.3d 158, 163 (3d Cir. 2009).)

[16] After asking the Court for four (4) extensions in order to allow DHS to produce the relevant documents and conduct necessary redactions, the Government actually instructed DHS to cease document production and redaction once it filed its own motion to dismiss, despite its production obligation remaining in effect. (Op. at 61.)

16

## C. The Parties Receive the Color Copies of the DHS Forms

On March 14, 2018, Reyes-Romero filed color copies of the 2011 DHS Removal Forms, that were turned over to his counsel by the Government, as attachments to his brief opposing the Government's motion to dismiss. The color copies are attached to this Opinion at Exhibits C and D. (ECF No. 63-1 to -6.)

At that point, the cat was conclusively out of the bag. The color copy of I-826, which showed that Reyes-Romero had selected two contradictory options with respect to seeking a hearing, also showed that the selection marks indicating a desire to *waive* the right to a hearing was made partially in light blue ink, the same light blue ink that marks Officer Darji's signature.[17] The selection next to the option *requesting* a hearing is entirely in black, the same black that marks Reyes-Romero's signature. The Court noted in its prior Opinion that it "harbors substantial doubt that Reyes-Romero personally made the critical [waiver] notations." (Op. 11 n.6.)

According to the Government, the color copies were not a factor in its decision to move for dismissal of the Indictment because the Government had reached that decision prior to its review of the color copies. (ECF No. 66, at 7.) It also asserts, without opposition, that it had requested the color copies from ICE in early March 2018, and prior to that time, both parties in this case were operating with solely the black-and-white versions. (ECF No. 105, at 18.) But that would not get the United States off the hook, since the DHS Officers knew full well what they did in 2011 and what the color copies of the Forms would show. *Dennis v. Sec'y, Pa. Dep't of Corr.*,

---

[17] The Court can best describe the "waiver" selection as a small thin black X as well as a light blue slash (or what may better be described as half of an X). On the other hand, the "hearing" selection is best described as a boldened X, as if it was reinforced.

834 F.3d 263, 278 (3d Cir. 2016) ("[F]avorable evidence in the police's possession is imputed to the prosecution.").

About a week after the color copies of the Forms were filed with the Court—eleven (11) weeks after the DHS Officers testified and three (3) weeks after the Court warned the Government that it must take a position with respect to the veracity of its own witnesses' testimony—the Government, for the first time, informed the Court that it "does not rely on or adopt" the Officers' testimony. (ECF No. 66, at 7.) It also asserted that it would not "present argument" on any § 1326(d) issue other than the prejudice issue. (*Id.*) The Court then prodded the Government on its position with respect to its own witnesses' testimony. At the March 22, 2018, hearing, the Court and the Government had the following exchange:

> **[Prosecutor]:** Your Honor, we are saying that we will not rely on that testimony moving forward in this case.
>
> **THE COURT:** Why? Why won't you rely on it?
>
> **[Prosecutor]:** Your Honor, we don't feel that that testimony can support a verdict for the Government on the first two prongs of the *Charleswell* case.
>
> **THE COURT:** If believed, it's legally insufficient? Or I shouldn't believe it?
>
> **[Prosecutor]:** We understand that Your Honor will make the final decision as to whether that testimony could be believed or not. We recognize that, Your Honor.
>
> **THE COURT:** Well, I understand that. I'm asking the lawyer for the United States of America, should I believe that testimony?
>
> **[Prosecutor]:** Your Honor, you should give it as much weight as you see fit.

(ECF No. 77, 27:7–22.)

18

In the Court's estimation, this is a remarkable position to be taken by the United States Department of Justice—the agency entrusted by law and constitutional custom with speaking in federal Court, this federal Court, on behalf of the people of the United States. To this day, DOJ tells the Court that it should treat the only testimonial evidence the DOJ offered to the Court—testimonial evidence from the federal officers who were in "the room where it happened"[18]—as some type of evidentiary jump ball.

The United States did not then, and does not now, have the luxury of punting on the credibility of its own (and its only) witnesses in such a case as this, and this indifferent approach to its central obligations to the truth-seeking process in federal court adds substantial support to the Fee Application here, as will be further explained below.

For the remainder of the case, the Government maintained a non-committal position with respect to the Officers' testimony. While it stopped affirmatively relying on the testimony and did not present further arguments on the first two elements of § 1326(d), the Government never addressed whether the testimony was credible or was reliable. The Government never acknowledged that the purported waivers on the Forms were what they facially demonstrated—invalid—or that the DHS's reliance on them in 2011 was contrary to law and due process. Instead, the parties proceeded to battle over the second prong of the last element of the § 1326(d) test—the prejudice issue.[19]

---

[18] Leslie Odom, Jr., *The Room Where It Happened, on* Hamilton: Original Broadway Cast Recording (Atl. Recording Corp. 2015).

[19] *See* note 11 *supra.*

**D. The Government's Position with Respect to Its Authority to Speak for DHS**

As the litigation of this criminal case continued, two issues that were largely intertwined surfaced. First, given Reyes-Romero's request for release on bond, the Court needed to sort through the interplay between an Article III court potentially granting bond and conditions of release and an ICE detainer. Second, in order to appreciate the difference between the Government's motion to dismiss and Reyes-Romero's motion to dismiss, the Court needed to sort through the impact of an adjudication of the § 1326(d) affirmative defense and an outright dismissal of the Indictment with no adjudication. For both issues, the question returned to "what will DHS do next?"—be that a reinstatement of the prior 2011 Removal Order or initiation of new removal proceedings without any reliance on the 2011 Removal and the involved Forms. The Government, as at the prior hearing, was simply unwilling to provide any insight into DHS's position, or apparently to lift a finger to figure it out.

At the March 22 hearing, which was scheduled as a "bond hearing," when asked whether ICE would detain Reyes-Romero should the Court release him on bond pending the resolution of this criminal matter, the Government responded that it simply could not "speak to what ICE would do," even though the interplay between detainers was *the* issue placed on the table prior to the March 22 hearing. (ECF No. 77, at 19:3–4.) Again, an ICE Officer was seated at the Government's counsel table. (*Id.* at 3:18–20.) The Court asked why the prosecutor could not simply ask the ICE Officer there and then. (*Id.* at 19:5–14.) The prosecutor did not do so, articulating that the ICE Officer present was simply a "line Officer," and as an Assistant United States Attorney, he himself had limited delegated authority from the Attorney General and could not speak for or bind ICE. (*Id.* at 19:15–20:17.) The Court asked if the proceedings should be paused so the Assistant U.S. Attorney could locate someone with such authority from DHS. The Assistant U.S. Attorney

20

declined the invitation. (*Id.* at 20:15–21:22.) Notably, it also became clear at the March 22 hearing that the Assistant U.S. Attorney *had* been in contact with a DHS attorney and had suggested that defense counsel speak with that DHS lawyer on matters related to future immigration proceedings brought against Reyes-Romero. (*Id.* at 39:20–40:10.) Apparently the DOJ could and did actually communicate with DHS about matters of interest to it, but elected to remain robustly ignorant as to the matters specifically raised by the Court.

This, combined with the Government's contradicting articulations for dismissal of the Indictment without adjudication on the merits of the § 1326(d) defense, led the Court to conclude at that March 22 hearing that it had "a reasonable basis to believe the Department of Homeland Security want[ed] the indictment dismissed so it can rely on [the 2011 Removal Order]," in spite of the Court's tentative findings that such Removal Order was contrary to law. (ECF No. 77, at 54.) The Government did not dispute the Court's observations, nor could it after taking the position that it was simply not privy (and would and could not become privy) to the decision-making of DHS.

In the end, the parties completed briefing on the cross motions to dismiss, which included extensive briefing by both sides on the § 1326(d) prejudice issue. The Court ultimately ruled for Reyes-Romero. (Order, ECF No. 93.) It held that Reyes-Romero met his burden to show all three elements of the § 1326(d) affirmative defense and that the 2011 Removal order was invalid. (Op., ECF No. 92; ECF No. 93.) In the same Opinion and accompanying Order, the Court denied the Government's motion to dismiss, concluding that the evasive (and at times affirmatively deceptive) maneuvers in this case by the federal government writ large demonstrated a real risk of prosecutorial harassment against Reyes-Romero, in the form of likely removal proceedings

21

following the dismissal of the Indictment in which DHS would rely on the invalid 2011 Removal Order.[20] (Op. at 54–55.)

## II.    Legal Standard

The "Hyde Amendment" refers to the statutory provision that gives district courts the authority to award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith. The Hyde Amendment reads,

> [T]he court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) . . . may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under [the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412].

18 U.S.C. § 3006A (statutory note).

Our Court of Appeals discussed the Hyde Amendment legal analysis in detail in *United States v. Manzo*, 712 F.3d 805 (3d Cir. 2013). It explained:

> [T]he Hyde Amendment places a daunting obstacle before defendants who seek to obtain attorney fees and costs from the government following a successful defense of criminal charges. In particular, a defendant must show that the government's position underlying the prosecution amounts to prosecutorial misconduct — a prosecution brought vexatiously, in bad faith, or so utterly without foundation in law or fact as to be frivolous. The defendant bears the burden of meeting any one of the three grounds under the statute, and acquittal by itself does not suffice.
>
> That burden is made more difficult by the approach courts take in assessing the government's litigation position. In determining whether a position is vexatious, frivolous or in bad faith, courts make only one finding, which should be based on the case as an inclusive whole. A count-by-count analysis is inconsistent with this approach. In addition, when the legal issue is one of first impression, a court should

---

[20] Reye-Romero's Motion for Release on Bond was dismissed as moot in light of the dismissal of the Indictment. (July 2, 2018, Order, ECF No. 93 ¶ 2.)

be wary of awarding fees and costs so as not to chill the ardor of prosecutors and prevent them from prosecuting with earnestness and vigor.

*Manzo*, 712 F.3d at 810 (internal quotations and citations omitted). Here is what *Manzo* teaches:

- The position of the United States is vexatious when it is both (1) "objectively deficient, in that it lack[s] either legal merit or factual foundation," and (2) viewed objectively to be the product of "maliciousness or an intent to harass or annoy." *Id.* (quoting *United States v. Knott*, 256 F.3d 20, 29 (1st Cir. 2001)).

- The position of the United States is frivolous when it is "groundless[,] with little prospect of success." *Id.* (quoting *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999)). A frivolous position includes a position that is foreclosed by binding precedent, obviously wrong, lacking a reasonable basis, or lacking a reasonable expectation of attaining sufficient material evidence by the time of trial, but a position is not frivolous merely because it lacks precedent. *Id.* at 810–11 (collecting cases describing "frivolousness"). "A 'frivolous' position can be distinguished from a 'vexatious' one in that 'the term vexatious embraces the distinct concept of being brought for the purpose of irritating, annoying, or tormenting the opposing party.'" *Id.* at 811 (quoting *United States v. Heavrin*, 330 F.3d 723, 729 (6th Cir. 2003)).

- The position of the United States demonstrates bad faith when there is an implication of conscious wrongdoing. It is an objective inquiry that focuses on whether the Government acted upon "a state of mind affirmatively operating with furtive design or ill will." *Id.* (quoting *Gilbert*, 198 F.3d at 1299).

Under the Hyde Amendment, "[w]hen assessing whether the 'position of the United States was vexatious, frivolous, or in bad faith,' the district court should therefore make only one finding, which should be based on the 'case as an inclusive whole.'" *Heavrin*, 330 F.3d at 730 (quoting

23

*Comm'r, INS v. Jean*, 496 U.S. 154, 162 (1990)); *see also Manzo*, 712 F.3d at 810–11 (quoting

*Heavrin*).

> Evaluating a case as an inclusive whole is not susceptible to a precise litmus test. The fact that only one count among many is frivolous or not frivolous is not determinative as to whether a movant should receive an award under the Hyde Amendment. Even if the district court determines that part of the government's case has merit, the movant might still be entitled to a Hyde Amendment award if the court finds that the government's "position" as a whole was vexatious, frivolous, or in bad faith. By the same token, a determination that part of the government's case is frivolous does not automatically entitle the movant to a Hyde Amendment award if the court finds that the government's "position" as a whole was not vexatious, frivolous, or in bad faith. The district court, in other words, must not fail to see the forest for the trees.

*Heavrin*, 330 F.3d at 730. Again, the district court must "inquire into the merits of the entire case,"

assessing it as an "inclusive whole." *Id.* at 731.

In addition to requiring that the Government's position be vexatious, frivolous, or in bad

faith, recovery under the Hyde Amendment is subject to additional restrictions and procedures set

forth in the EAJA, 28 U.S.C. § 2412(d), none of which are contested here.[21] *United States v. Claro*,

579 F.3d 452, 457 (5th Cir. 2009) (joining consensus among circuits that the Hyde Amendment

incorporates only those procedures and limitations in subpart (d) of 28 U.S.C. § 2412 and

collecting cases); *United States v. Adkinson*, 247 F.3d 1289, 1291 n.1 (11th Cir. 2001).

---

[21] The Government made no objections related to Reyes-Romero's § 2412(d) qualifications, so the Court will not address the application of those provisions here. *See Scarborough v. Principi*, 541 U.S. 401, 414 (2004) (EAJA's § 2412(d)(1)(B) requirements do not concern a federal court's subject-matter jurisdiction); *Vasquez v. Barnhart*, 459 F. Supp. 2d 835, 836 (N.D. Iowa 2006) ("Because the [Supreme] Court has clarified that the requirements of section 2412(d)(1)(B) are not jurisdictional, but are ancillary to the court's judgment, the . . . requirements can be waived by the Government, as it is the Government whose interests are protected by the section's requirements.").

## III.   Discussion

The central question put before this Court is whether the position of the United States in the prosecution of Reyes-Romero was vexatious, frivolous, or in bad faith. Upon review of the record before the Court, viewing this case "as an inclusive whole," the Court finds and concludes that the position of the United States was both frivolous and in bad faith. *Manzo*, 712 F.3d at 810.

### A. The Position of the United States Includes Reference to DHS

When reviewing "the position of the United States," the Court examines the litigation position of the DOJ through this District's U.S. Attorney's Office and the actions taken (or not taken) by the federal agency upon which the criminal case is based.[22] *See United States v. Holland*, 34 F. Supp. 2d 346, 360 n.25 (E.D. Va. 1999) (examining conduct of FDIC for purposes of determining Hyde Amendment petition);[23] *United States v. Gardner*, 23 F. Supp. 2d 1283, 1294–95 (N.D. Okla. 1998) (same with respect to IRS). Therefore, the Court's examination of the Government's position in this case must also incorporate record evidence of the actions and lack of actions by DHS in relation to the criminal prosecution.

The Court must also delineate what actions by DHS are deemed to be in relation to this criminal case. "[T]he scope of the record in any Hyde Amendment case must be determined by a

---

[22] The Hyde Amendment explicitly incorporates the procedures and limitations (except the burden of proof) provided for an award under 28 U.S.C. § 2412(d). *See Claro*, 579 F.3d at 457. That subsection specifically defines the "position of the United States" as two-fold: "the position taken by the United States in the civil action [and] the action or failure to act by the agency upon which the civil action is based." 28 U.S.C. § 2412(d)(2)(D). "Accordingly, our decisions 'have consistently defined 'position of the United States' as 'not only the litigation position . . . but also the agency position [that] made the lawsuit necessary.'" *Taylor v. Heckler*, 835 F.2d 1037, 1040 (3d Cir. 1987) (quoting *Lee v. Johnson*, 801 F.2d 115, 116 (3d Cir. 1986) (Becker, J., dissenting from denial of petition for rehearing in banc)).

[23] In *Holland*, the court granted the Hyde Amendment petition and initially assessed a portion of the attorney's fees and expenses against the FDIC, but the court vacated its assessment of damages against the FDIC because it recognized that the defendant's amended petition for an award was

25

review of all the facts and circumstances." *Gardner*, 23 F. Supp. 2d at 1295. The EAJA, incorporated into the Hyde Amendment, "specifically contemplates that the court will consider actions and events prior to the initiation of litigation." *Id.* In this case, the actions of DHS Officers in 2011 are part and parcel with the DOJ's 2017 criminal indictment. The 2011 Removal Order was a necessary element to the criminal charge, and the Government relied on that Removal Order (and the conduct therein) for a significant amount of time until it was forced to begrudgingly retreat from its position.[24] Even though the Government backed away from (but did not affirmatively disavow) those events later in the criminal prosecution, the Court concludes that the evidence in the record related to the conduct of DHS Officers in the 2011 Removal Proceedings is properly included in the scope of the record to be considered in the Court's examination of the position "of the United States" in this criminal case.[25] Although the Government argued against including the conduct of federal officers in 2011 in the Government's "position" for purposes of evaluating the Fee Application, it offered no legal support for why the events that it necessarily relied on to satisfy

---

only brought against the DOJ and/or the U.S. Attorney's Office and the FDIC was not properly before the Court. The *Holland* Court acknowledged that a petition against "the United States" could be interpreted broadly enough to include other agencies of the United States Government, but in that particular case, "it appear[ed] that the Hollands purposefully did not seek relief against the FDIC . . . in their amended petition." 48 F. Supp. 2d 571, 580 (E.D. Va. 1999). Here, DHS has been given notice of the Fee Application by the Government and the Court interprets the Fee Application to include consideration of the conduct of DHS.

[24] When faced with a challenge to the validity of the 2011 Removal Order, the Government defended the series of events, devoting an entire day's hearing to providing the Court with testimonial accounts of "what happened" in 2011 with the live testimony by the very DHS Officers involved.

[25] However, as explained below, the ultimate finding that the position of the United States was both frivolous and in bad faith would not be altered if the scope of the record excluded the conduct of DHS Officers in 2011, as the record evidence of the conduct by DHS from 2017 to present alone meets the standard for such a finding as it pertains to the agency prong of the "position of the United States."

an element of the offense charged against Reyes-Romero should not also be included in the record here.

## B. The Position of the United States Was Frivolous and in Bad Faith

The Court finds by a preponderance of the evidence[26] that the position of the United States was both frivolous and in bad faith. The United States need not make a wrong turn at every corner to justify the imposition of a Hyde Amendment award, *Heavrin*, 330 F.3d at 730, but the misconduct of the United States at multiple key points before and during the criminal prosecution and on multiple key issues in this litigation was completely divorced from fact and law and demonstrated conscious wrongdoing.

The federal government plainly railroaded Reyes-Romero out of the country in 2011. The Court has already found and concluded that the Forms, completed in 2011, were "internally and inherently contradictory" to the point of being indiscernible as to any actual waiver of rights by Reyes-Romero. (Op. at 16.) The Court was able to reach this conclusion by examining the facial defects on the Forms. (*Id.* at 16–17.) With respect to the I-851, "[t]he Defendant signed the 'waiver' section before it was entirely explained to him in his native language, he signed the waiver section before it was served on him, and it was served on him before it was issued. In short, he supposedly signed away his rights before he was charged and before those rights were read to him in Spanish." (*Id.* at 17.) "[T]he involved Officers elect[ed] to run roughshod over not only what they testified were the standard and required DHS procedures, but also over any semblance of due process." (*Id.* at 19.) As extensively explained in this Court's July 2, 2018, Opinion and again here,

---

[26] "[A] party moving for an award of attorney's fees under the Hyde Amendment must establish by a preponderance of the evidence that the government's position was vexatious, frivolous, or in bad faith." *United States v. Velardi*, No. 06-cv-00659, 2008 U.S. Dist. LEXIS 62257, at *4–5 (E.D. Pa. Aug. 14, 2008) (quoting *United States v. Truesdale*, 211 F.3d 898, 908 (5th Cir. 2000)).

27

the conduct by the DHS Officers in 2011 had no basis in law and easily meets the definition of "frivolous." It was contrary to what the DHS Officers stated was DHS policy, was foreclosed by binding authority (i.e. the due process clause of the Constitution), and was lacking in any reasonable factual or legal basis. *Manzo*, 712 F.3d at 811.

Even if the scope of the Court's review did not extend to the DHS Officers' conduct in 2011, the 2018 testimony by those same DHS Officers about "what happened" in 2011 and their description and explanation about what the Forms "showed" demonstrates clear bad faith. The Court's conclusions in its July 2, 2018, Opinion that the Officers lied and were motivated to lie in a weak attempt to sell to the Court the nonsense they generated in 2011 plainly evidences "conscious doing of wrong." *Id.* This is not a case where law enforcement's misconduct "could just as well rested on an honest mistake of fact or misapprehension of the authority they had been granted." *Knott*, 256 F.3d at 31 (reversing district court's grant of Hyde Amendment award). Based on the Court's review of the record, its own examination of the witnesses, and its personal observations relative to the testimony in open Court, the Court confidently concludes that the DHS Officers were affirmatively acting with "furtive design." *Manzo*, 712 F.3d at 811.[27]

In *Knott*, the district court based its finding of vexatiousness on its "determination that there was 'credible evidence'" of altered sampling results that led to the EPA obtaining a federal search warrant, specifically that the final recorded measurement appeared to be written over a different measurement. 256 F.3d at 24, 31. The First Circuit, reversing the district court, concluded that this determination by itself was insufficient to establish a vexatious prosecution because the record showed that other properly recorded samples also showed EPA violations and the district

---

[27] Because those Officers well knew that they had cooked up Reyes-Romero's 2011 Removal, they too were bound by *Brady* to disclose what they had done and the documentary and testimonial evidence of their conduct. *Dennis*, 834 F.3d at 288.

court made no findings as to *why* annotations had been altered, "just that there was 'credible evidence' that they may have been." *Id.* at 32. The First Circuit hypothesized that the alteration could have been for any number of reasons, "some as benign as the correction of a mistake." *Id.* "Since the existence of the purported alterations is equally open to benign and malign interpretations on the present record, it hardly provides sufficient evidence of vexatious conduct." *Id.*

Here, unlike *Knott*, the Court has already found that the DHS Officers' false testimony was given in an effort to "explain away prior testimony" of the Officers' misconduct during the 2011 Removal Proceedings. (Op. at 15.) The Court has also already found that the misconduct during the 2011 Removal Proceedings "[ran] roughshod over . . . the standard and required DHS procedures, but also over any semblance of due process." (*Id.*) Even though this Court in its previous Opinion only went so far as to state that it had "substantial doubt" that Reyes-Romero personally made the critical waiver notations, when viewing the specific facts of the case there simply is no "benign" explanation for a DHS Officer selecting a key waiver provision on behalf of a detainee who is plainly capable of marking and signing a document himself, especially when the testimony was that Reyes-Romero "held the pen." (*Id.* at 11 n.6.) Of course, this is just one "flaw" of many evidenced on the face of the Forms. There is no plausible "benign" explanation for the manner (and order) in which the Forms were completed.[28] Both the 2018 false testimony and the 2011 conduct by the DHS Officers provide strong evidence of frivolousness and bad faith.[29]

---

[28] The simplest explanation could have been that the times on the Forms were rounded or that different clocks were used to note different times. Both of these explanations were ruled out by the Officers' own testimony. (*See* Op. at 10 n.5, 14.)

[29] So that there is no doubt, in light of the specific analysis the Court is now required to make in

29

The other prong of the "position of the United States," the position of the DOJ, was also frivolous and in bad faith. First, the DOJ relied upon the facially invalid waivers to indict and seek to prove the necessary element that Reyes-Romero "had been previously deported and removed from the United States *pursuant to law*." (ECF No. 1.) The Government's reliance on the black-and-white copies of the Forms was obviously flawed. The Forms facially demonstrate that there was no valid waiver due to their patent inconsistency, so the Government's position "lack[ed] a reasonable expectation of attaining sufficient material evidence by the time of trial." *Manzo*, 712 F.3d at 811. There is no better evidence of this than the fact that when the Government put on witnesses (who it purports to have interviewed prior to putting them on the stand) to explain the facial defects, things inexorably went from bad to worse as their testimony shifted from essentially incoherent to false. *Cf. United States v. Capener*, 608 F.3d 392, 401–02 (9th Cir. 2010) (Government's position was not frivolous when there was no evidence that the Government had any affirmative reason to believe its theory was wrong.).

While the Government's position with respect to the Forms was certainly and woefully mistaken at the time of Indictment and likely up to the first hearing, its position following the testimony of its witnesses transitioned from mistake to misconduct (as a term of art used in the Hyde Amendment context) as there were ample "affirmative reason[s] for the [G]overnment to know such reliance [was] misplaced." *Id.* at 402. The Government continued to advocate that the 2011 Removal Proceedings were conducted pursuant to law, long after the DHS Officers presented testimony that was rife with internal and inherent contradictions and long after the Court found

---

the Hyde Amendment context, the Court finds, based on the Court's examination of the color copies and its consideration of the testimonial record, that Reyes-Romero did not place the blue markings on the I-826 where he purported to waive a hearing. Rather, one of the DHS Officers made that notation.

and stated that material portions of that testimony were lies.[30] The Government stuck to this position even after one DHS Officer admitted on the stand that his testimony (given just moments before) was, in fact, nonsense,[31] and even after the Court gave the Government an opportunity to "stop and think" before the Government pressed on. Even after it filed its own motion to dismiss the Indictment with prejudice, the Government did not back away from its litigation position as to the validity of the waivers. Only after the Court reminded the Government (two months later) at the March 2, 2018, hearing that it could not play dodgeball with the Court and would have to take a position on the truthfulness of its own witnesses' testimony did the Government back away from its "valid waiver" arguments. And even then, the Government only ceased "present[ing] argument" on the elements, refusing to simply concede the first two elements of § 1326(d). (ECF No. 67, at 7.) This fits comfortably within *Manzo*'s definition of a frivolous position. *Manzo*, 712 F.3d at 810–11.

The Government argues that its ultimate decision to move on from its valid waiver argument is enough to absolve it of its earlier conduct. The Court does not agree. It took the Government over two months, filled with extensive litigation and multiple opportunities, to "see the light." *Cf. United States v. Lain*, 640 F.3d 1134, 1139 (10th Cir. 2011) (When the Government acts "promptly to correct its error," it is less likely that its conduct is vexatious, frivolous, or in bad faith.) To the extent that the Government had an opportunity (months later) to negate evidence of its frivolousness by sufficiently correcting its earlier position, it lost that opportunity because it did not, in fact, correct that misconduct. The Government simply ignored it.

---

[30] The Court will revisit the Government's treatment of the Officers' testimony later in this Opinion.

[31] He confirmed that his testimony did not "make any sense." (Op. at 22.) The absence of a statement making sense is commonly referred to as "nonsense."

The Government's position with respect to its "valid waiver" argument demonstrates frivolousness, as did its position with respect to its witnesses' testimony. DHS Officers (admittedly) testified nonsensically on the stand and did so in an effort to shield their misconduct in 2011, and the Government stood by what the Court expressly found was false and incredible testimony.

The Court criticized this approach in its prior Opinion, stating that such a noncommittal position with respect to the credibility of the Government's own witnesses is contrary to law, citing *United States v. Harris,* 498 F.2d 1164, 1169 (3d Cir. 1974). (Op. at 60.) The Government argues that its conduct in this prosecution is not of the egregious type admonished in *Harris*, where the Government had remained silent while a witness disclaimed a fact known to the Government to be true. 498 F.2d at 1168. The Government here asserts that because this Court never made a finding that the Government *knew* that the DHS Officers testified to a fact that was false (or disclaimed a fact that the Government knew to be true), the Government's shift from affirmatively advancing the testimony to a not-adopt-but-not-disavow position conforms with its obligations under *Harris*.

That is "slicing the baloney mighty thin." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1215 (2018).

Within moments of hearing one DHS Officer's testimony, the Court asked the Officer if his own testimony made any sense to him (to which the Officer answered that it did not), and then the Court immediately recessed proceedings to explicitly give the parties (really, just the Government) time to process that testimony. The fact that the Court concluded that the Government did not knowingly *present* false testimony[32] does not mean that once the Government

---

[32] There is insufficient evidence in the record from which the Court would conclude, here and

32

heard from its own witnesses what was plainly self-serving prevarication which contradicted the Forms on which the Government had relied, it had "the luxury of taking a position of ambivalence." (Op. at 19 n.12.) *See also Banks v. Dretke*, 540 U.S. 668, 672, 675–76 (2004) (admonishing the government for allowing false testimony to stand uncorrected and holding that when law enforcement conceals "significant exculpatory or impeaching material," the government has a duty to "set the record straight"). Furthermore, the Court is confident that had it not repeatedly inquired into the Government's non-committal position as to its own witnesses' testimony, the Government would not have even considered whether to reconsider its position of affirmatively advancing that testimony.

The conduct of the United States in this litigation, considered as a whole, was groundless in law and in fact. *See Adkinson*, 247 F.3d at 1293 (When the government's prosecutorial position is groundless in law "not only when the [G]overnment brought the indictment, but also throughout the presentation of its case-in-chief," it is an abuse of discretion to *deny* a Hyde Amendment award.). This case closely resembles *United States v. Braunstein*, in which the Ninth Circuit reversed the district court's denial of a Hyde Amendment award. 281 F.3d 982, 996 (9th Cir. 2002). The Ninth Circuit concluded that the DOJ had acted frivolously when they brought a prosecution for fraud despite having substantial information that the alleged victim of the fraud could not have been deceived by the alleged fraudulent acts. *Id.* The well-documented evidence showed that the

---

now, that the Government knowingly presented false testimony, and Reyes-Romero chose not to seek to develop or introduce evidence related to the Government's pre-hearing interviews of its witnesses. (*See* ECF No. 105, at 14 n.3 (Government produced notes of those interviews to defense counsel on January 2, 2018).) However, it is difficult to discern what the factual account from those witnesses could possibly have been during those interviews that would have explained away the facial defects on the Forms so as to persuade the Government to put on the testimony, and if the pre-hearing witness interviews matched the testimony actually presented, it is difficult to imagine why the Government thought calling those witnesses was either appropriate or even legitimate.

Government's theory of the case "was so obviously wrong as to be frivolous." *Id.* The same is true here. The Government's position that Reyes-Romero was previously removed from this country *pursuant to law* based on his waiver of rights is "so obviously wrong as to be frivolous." *Id.* Like in *Braunstein*, the fact that the Government eventually moved to dismiss the Indictment is insufficient to overcome its frivolous position. *Id.* at 991 (After the district court denied the motion for a continuance of the trial date, the Government moved to dismiss Braunstein's indictment.)

This is not a case where there was "simply [] a witness whose testimony directly inculpate[d] the defendant [was] arguably not credible," which the Second Circuit has held is alone insufficient to support a Hyde Amendment award. *United States v. Bove*, 888 F.3d 606, 611 (2d Cir. 2018). For starters, the evidence of the 2011 Removal Proceeding via the Forms demonstrated serious holes in the Government's theory of the case before a single witness testified, obliterating any hope of success on two of the three § 1326(d) elements. In any event, the Government's witnesses did not merely present "not credible" testimony. *Id.* The witnesses' testimony in this case was self-described as nonsensical, and its facial inconsistency and incoherence demonstrated that at least material parts of it were false. The black-and-white copies of the Forms facially demonstrated that the Government's "waiver of rights" position did not ever hold water, and the color copies of the Forms removed all doubt. There was no evidence presented that lent a scintilla of support for the Government's contention that the 2011 Removal Proceeding was conducted pursuant to law. *Cf. Bove*, 888 F.3d at 611 n.29 (Government submitted an affidavit that it had another witness and other evidence to support its theory of the case).

The conduct described thus far sufficiently tainted the entire criminal prosecution with frivolousness and bad faith such that the position of the United States as a whole would meet the

34

standard for an award under the Hyde Amendment. However, there is additional evidence of bad

faith in the record for the Court to consider.

The Government's attempted maneuvers to shield the 2011 Removal Order from an

adjudication of invalidity demonstrates at best a position lacking any reasonable basis and at worst

a course of conscious impropriety. As this Court held in its prior Opinion:

> The Government was willing to dismiss its own Indictment with prejudice, but it
> would not consent to the Court's granting of the Defendant's Motion to Dismiss.
> (Tr. of Proceedings, ECF No. 57, 6:18–24, 30:5–7.) The difference between the
> "cross" Motions to Dismiss Indictment is that the Defendant's Motion to Dismiss,
> now granted, attacks the validity of the underlying 2011 Removal Proceeding. The
> ultimate effect of granting the Defendant's Motion to Dismiss on its merits on any
> future removal proceedings against the Defendant is uncertain, as that issue in the
> first instance is for an immigration court (and perhaps ultimately the Court of
> Appeals). But without an adjudication of the Defendant's Motion (or the
> Government's concession to it), the conduct and result of the 2011 Removal
> Proceeding would be shielded from public examination, notwithstanding that the
> Government relied on that very Removal Proceeding in seeking the Defendant's
> Indictment. This is important since, as the Government conceded at the hearings in
> this case, the United States could (and may well) simply now seek to rely on the
> 2011 Removal Process, the fatally flawed Forms, and the resulting 2011 Removal
> Order in this case in future removal proceedings. (ECF No. 77, 37:23–38:12.)

(Op. at 52.) Furthermore, the United States "steadfastly refused to provide any assurance that the

Forms, and the 2011 Removal Proceeding, will not be relied upon in future proceedings against

the Defendant." *(Id.* at 52.) To justify its drawn veil over DHS actions, the Government invoked

what this Court has termed, "a bureaucratic wall within the Executive Branch," in which the DOJ

brought a motion to dismiss a criminal indictment, but then asserted that any future immigration

proceedings, where "liberty itself may be at stake," are solely within the purview of the DHS. *(Id.*

at 55–56 (quoting *Young v. United States*, 481 U.S. 787, 810 (1987)).) As this Court previously

explained,

> "While the Department of Justice has decided that it will seemingly not pursue the
> Defendant further on this criminal charge in this Court, its lawyers, lawyers for the
> United States, have declined to affirmatively disclaim that the federal Executive

> Branch won't continue to fully rely on the Forms or the 2011 Removal in any upcoming Removal (or other) proceedings as to the Defendant—Forms and a process which the Court has described as 'wholly unlawful.'"

(Op. at 56.)

The Government defends DOJ's isolationist position, pointing to cases describing the limits of a U.S. Attorney's authority to bind other executive departments. *See, e.g., United States v. Igbonwa*, 120 F.3d 437, 444 (3d Cir. 1997) ("[A] promise made by the United States Attorney's Office relating to deportation does not bind the INS *without explicit authority from the INS*." (emphasis added)). The Court agrees with the Government that the U.S. Attorney's Office may perforce not have blanket authority to bind other parts of the Executive Branch, but in light of the intertwining activity of DHS and DOJ in *this* case, *Igbonwa* also begs the question here: did the United States Attorney's Office not seek such authority from DHS or did DHS not give that authority? Either way, it became clear in this case that the federal government was attempting to manipulate the system to have it both ways. This is an abuse of both the administrative and judicial process that is profound evidence of bad faith for Hyde Amendment purposes.

At the time the DOJ filed its motion to dismiss, it had adopted the position that the DOJ is "some sort of stranger to the important work of formulating federal immigration policy and leading its enforcement." (Op. at 57.) But one need not look further than this case for an example of the interdepartmental cooperation between the DHS and the DOJ with respect to immigration matters. The underlying administrative proceeding, the 2011 Removal (completed entirely by DHS), "play[s] a critical role in the subsequent imposition of [the] criminal sanction." *Mendoza-Lopez*, 481 U.S. at 837–38. Reyes-Romero was then arrested by "a fugitive operations team" comprised of DHS's enforcement officers. (Gov't Br., ECF No. 17, at 2; Tr. of Proceedings on Jan. 4, 2018, ECF No. 31, at 125:15–19.) Of course, at this point, the federal government had a choice as to

36

whether to proceed only with new administrative removal proceedings or to "invite[] judicial scrutiny of the underlying removal order by instigating a criminal prosecution under § 1326." *Villa-Anguiano v. Holder*, 727 F.3d 873, 880 (9th Cir. 2013).[33] In this case, the DOJ pursued a criminal prosecution.

Then, at every hearing except one, the DOJ had a DHS Officer at counsel table.[34] The DOJ relied upon (1) the fugitive operations efforts of DHS to arrest Reyes-Romero, (2) the actions of DHS both in regard to the 2011 Removal and at the time of indictment to bring this criminal prosecution against Reyes-Romero, (3) testimony from DHS agents to defend its prosecution against Reyes-Romero's affirmative defense, and (4) DHS Officers were seated at counsel table throughout the case. But when the possible future actions of DHS were placed front and center by the Government's own motion to dismiss, the "Government" took the position that it could not speak for or on behalf of DHS. Even when the Court offered to pause the proceedings so the DOJ

---

[33] The Government cites to *Villa-Anguiano* for the premise that "judicial invalidation of a prior order of removal does not categorically bar reinstatement of the same order by ICE." (ECF No. 105, at 30.) *Villa-Anguiano* held that "when, as a result of [invited judicial] scrutiny, a district court finds constitutional infirmities in the prior removal proceedings that invalidate the prior removal for purposes of criminal prosecution, the agency *cannot* simply rely on a pre-prosecution determination to reinstate the prior removal order." 727 F.3d at 880 (emphasis added). Instead, if an agency wishes to reinstate an invalidated removal order, it must follow regulatory requirements that provide the alien with an opportunity to be heard and that mandate the agency to "independently reassess whether to rely on the order . . . or instead to instigate full removal proceedings." *Id.* This certainly affords an alien more due process protections than the scenario in which the prior removal order is not invalidated by an Article III court.

[34] A DHS Agent was present at counsel table on both the January 3 and March 22, 2018, hearings and oral arguments. (ECF No. 30, at 2:6–8; ECF No. 77, at 3:18–20.) A different DHS Agent was present at counsel table on both the March 1 and 2, 2018, hearings and oral arguments. (ECF No. 57, at 2:6–8; ECF No. 58, at 2:8–10.) The transcript of proceedings on January 4, 2018, did not establish one way or another whether anyone else was seated at counsel table with the Assistant U.S. Attorney. (ECF No. 26.) For a discussion of the DOJ's response on the Court's request to involve DHS in the case to resolve questions that the DOJ purported it could not answer, see *supra* Part I.D.

could confer with DHS or reach out to someone from DHS who had authority to speak on its behalf and answer the Court's questions, the DOJ declined, even though when Reyes-Romero asked (outside the presence of the Court) questions about immigration proceedings, the DOJ put him in touch with counsel from DHS.

The Government invoked DHS as a sword against Reyes-Romero when such a tactic benefitted its prosecution. Yet it obstructed the Court's "independent responsibilities to protect certain rights, interests, and duties" necessary to grant the Government leave of Court to dismiss the indictment by suddenly invoking the bureaucratic wall it itself had erected between the DOJ and DHS. (Op. at 55 (citing *In re Richards*, 213 F.3d 773, 788 (3d Cir. 2000)).) When the Court combines this with the confusing (and often contradictory) reasons asserted by the Government for seeking dismissal of the Indictment, the Court is left with the conclusion that the position of the United States in this case was the product of the DOJ's conscious abuse of the judicial process resulting from and in furtherance of inter-agency cooperation between the DOJ and DHS.

Here is why that is the case. First, the Government claimed it wanted to dismiss the Indictment to save litigation resources, yet when its motion was taken under advisement, the Government then expended substantial resources on continuing to oppose Reyes-Romero's motion to dismiss. Second, the outcome for the DOJ under both motions to dismiss was the same: a bar from bringing a subsequent indictment against Reyes-Romero for reentry of removed alien based on these facts. Despite this, the DOJ did press on, expending resources and time to oppose any adjudication that would render the 2011 Removal invalid—an adjudication that would only impact and affect DHS. The Court concluded in its Opinion that this conduct was "taint[ed] with impropriety," Op. at 55–56, and stems from the Government's "principal motivation" to avoid "an

38

adjudication relative to the validity of the process used to engineer the 2011 Removal." (Op. at 55.)

Whether the endgame of all this was to enable DHS to simply recycle Reyes-Romero's 2011 Removal Forms with no impediments arising from its own misconduct in later removal proceedings or to cover up DHS's egregious constitutional violations (or both) is unknown. Either way, the DOJ (if it truly was divorced from DHS's interests and actions) should have been wholly ambivalent as to how the Indictment was dismissed, as the impact of dismissal via either its motion or Reyes-Romero's motion would have been the same vis-à-vis the DOJ. The *only* agency it could have made any difference to was DHS. Given that reality, the Court is compelled to conclude that the DOJ's representations to the Court that its actions were not being driven by the interests of DHS were simply baseless.

Finally, there is the lingering issue of the late-arriving color copies of the Forms. Reyes-Romero has not disputed the Government's assertion that the DOJ was unaware of the vivid amplification of the content of the black-and-white versions of the Forms via the color copies. But DHS obviously did possess the color copies at the commencement of this prosecution (evidenced by the reality that it had originally created the documents and, upon specific request, produced the color copies). There is a clear implication of conscious wrongdoing when the color copy of the I-826 shows a crucial marking attributed to Reyes-Romero in the identical color of the pen used by the DHS Officer (and not the pen used by Reyes-Romero) and yet only a black-and-white copy was submitted to the U.S. Attorney's Office when the Forms were placed into controversy.[35] The

---

[35] Of course, this issue is completely separate from the argument advanced by the Government that the I-826 was actually a pointless document completed for no reason whatsoever. That argument was plainly frivolous.

39

Court need not conclude, for purposes of deciding the pending Fee Application, that DHS's failure to timely disclose the color copies until specifically asked by the U.S. Attorney's Office constitutes a *Brady* violation, because it is enough for the Court to conclude that their failure to do so sufficiently shows Hyde Amendment bad faith.

The Government's remaining arguments in opposition to the Fee Application are unpersuasive. It argues that a granting of a Hyde Award in this case would conflict with the Eighth Circuit's decision in *United States v. Monson*, where the Eighth Circuit affirmed the district court's denial of Hyde Amendment award. 636 F.3d 435, 439–40 (8th Cir. 2011). In *Monson*, the district court made a *Franks* ruling in favor of the defendant, which "constitutes a finding that law enforcement deliberately lied or recklessly disregarded the truth when they included information in an affidavit used to obtain a warrant." *Id.* at 439 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). The Eighth Circuit held that "[a] *Franks* ruling does not necessarily mean that government prosecutors (assuming they did not participate in the preparation of the affidavit) deliberately lied or acted with a reckless disregard for the truth." *Id.* Instead of "automatically concluding" that the position of the United States was frivolous or vexatious for purposes of a Hyde Amendment award, the district court must "consider the individual facts of the case." *Id.* In evaluating whether the position of the prosecutors was frivolous, the Eighth Circuit examined the Government's arguments on whether there was a *Franks* violation. *Id.* at 440. The Eighth Circuit concluded that each argument that the Government made with respect to the *Franks* motion was non-frivolous. *Id.* at 440–41. This Court has followed *Monson*, first identifying the dishonest conduct of the DHS Officers and then analyzing the position of the Government based on the specific facts of the case. The Court has determined that the Government here made frivolous arguments both stemming

from, and also completely independent from, the misconduct of its witnesses. This significantly distinguishes this case from *Monson*.[36]

Lastly, the Government argues that because this Court must view the case as a whole, its lack of misconduct with respect to other litigation events and arguments outweighs the evidence of Hyde Amendment misconduct. The Court does not agree that this "good" (or at least, lack of misconduct) sufficiently outweighs the "bad" in this case. *Heavrin*, 330 F.3d at 730 ("Even if the district court determines that part of the government's case has merit, the movant might still be entitled to a Hyde Amendment award if the court finds that the government's "position" as a whole was vexatious, frivolous, or in bad faith.").

The Government's legal arguments as to the prejudice issue (e.g., whether Reyes-Romero would have been eligible for asylum, Convention Against Torture protection, or withholding of removal), although completely unsuccessful, did not brush up against any prosecutorial misconduct. Its legal arguments on these matters were largely reasonable and based in law, and this Court devoted a large portion of the July 2, 2018, Opinion to navigating the merits of each argument as argued by both parties. But, as the timeline of the case demonstrates, the prejudice issue was one that was almost entirely litigated on the papers, with the exception of some testimony

---

[36] Also, the court of appeals in *Monson* was reviewing the district court's denial of a Hyde Amendment award under the abuse of discretion standard, the same standard applied in this circuit. *Manzo*, 712 F.3d at 809. Interestingly, the *Monson* dissent concluded that the district court made a legal error and reviewed the record to determine whether that error was harmless. In this less deferential review, the dissent noted that "there [were] material facts in the record from which a reasonable trier of fact could hold 'the position of the United States' was 'in bad faith.'" 636 F.3d at 443–44 (Riley, C.J., dissenting) (quoting Pub. L. No. 105-119). "The United States typically is responsible for the knowledge and actions of state law enforcement officers acting on its behalf. Evidence exists that the prosecutor knew, or should have known, of the law enforcement officers' material falsehoods and omissions yet pursued an indictment against Monson." *Id.* at 445 (internal citation omitted).

41

by Reyes-Romero's family members at the January 4, 2018, proceeding. The prejudice issue was an issue that could have and should have been addressed immediately and swiftly after Reyes-Romero filed his motion to dismiss. Rather, this case was overwhelmingly and unnecessarily drawn out by the various litigation tactics taken by the Government and described above as to the waiver and form of dismissal issues.

Furthermore, the Government's argument completely ignores *Charleswell*'s "presumption of prejudice" rule, which this Court actually applied in its July 2, 2018, Opinion and Order. *Charleswell* provided that where procedural defects are "so central or core to a proceeding's legitimacy," prejudice may be presumed. 456 F.3d at 362 n.17. The Court determined that the presumption of prejudice applied in this case,[37] not just because of what happened in 2011, but also because of the DHS Officers' testimony and the DOJ's unwillingness to "set the record straight" on what happened in 2011. As this Court stated in its July 2, 2018, Opinion, "any actual understanding and exercise of his rights by the Defendant was stopped dead in its tracks by the DHS Officers who steered the Defendant to waive away his rights (or did it for him) before providing an explanation of such rights to the Defendant." (Op. at 50.) But most relevant to the Court's analysis here, "the dissembling and convoluted testimony of the DHS Officers clouded any opportunity for this Court to get an accurate idea of what actually happened in the 2011 Removal Proceeding." (*Id.*) Of course, that was exacerbated by the DOJ's motion to dismiss asking the Court to not rule on the validity of the 2011 Removal Order.

The Government argues now that it should not "be held liable under the Hyde Amendment for positions it never took on issue that were never litigated." (ECF No. 105, at 24 n.12.) It is

---

[37] That the Court did not simply stop with that conclusion but, out of completeness, ruled on every "prejudice" argument advanced by any party is in this Court's judgment of no moment for the Hyde Amendment analysis in this case.

42

entirely disingenuous for it to argue that this point was "never litigated." *Charleswell* was *the* seminal case addressing § 1326 and driving both parties' arguments from the beginning of the case to the end of the prosecution. As professors lecture law students, the reader disregards footnotes in judicial opinions (especially those from our own Court of Appeals) at her own peril.[38]

The Government's lack of response on the issue of presumed prejudice is not inculpatory evidence of bad faith or frivolousness, but it is not exculpatory either. Rather, it undercuts the United States' reasoning that its conduct during the prejudice portion of the case excuses its misconduct elsewhere in the case. The prejudice issue was but one tree in the forest, and, in this case, is not an arboreal life raft. *See Heavrin*, 330 F.3d at 730. The Government's ability to not commit misconduct during that one segment of this case does not override the multiple episodes of established misconduct, considering the proceeding as one inclusive whole.

Based on all of the circumstances of this case and viewing this case as a whole, the Court finds by a preponderance of the evidence and concludes as a legal matter that the position of the United States was frivolous and in bad faith. The Hyde Amendment ensures that the financial burden of withstanding such a prosecution does not fall on the acquitted defendant, and Reyes-Romero will be awarded attorney's fees and litigation costs incurred in defending this case.

---

[38] "[T]o one digging into the bowels of the law, a fat footnote is a mother lode, a vein of purest gold." Edward Becker, *In Praise of Footnotes*, 74 Wash. U. L. Q. 1, 6 (1996) (quoting Stanley H. Fuld, *A Judge Looks at the Law Review*, 28 N.Y.U. L. Rev. 915, 919 (1953)).

## C. Amount of Award

To support a Hyde Amendment award, "the prevailing party is required, inter alia, to 'submit to the court an application for fees and other expenses . . . [showing] the amount sought, including an itemized statement from any attorney . . . representing or appearing in behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed.'" *Claro*, 579 F.3d at 457 (quoting 28 U.S.C. § 2412(d)(1)(B)). Reyes-Romero attached to his brief in support of the Fee Application a declaration from his counsel that included the counsel's resume and a statement of his billings in this case. (*See* ECF No. 96, amended at ECF No. 107.)[39] In its brief in opposition to the Fee Application, the Government requested that, in the event the Court concludes that Reyes-Romero is entitled to a Hyde Amendment award, it be given an opportunity to submit "supplemental briefing regarding 'whether an increase in the cost of living or a special factor justifies an award above the fee cap. 28 U.S.C. § 2412(d)(2)(A).'" (ECF No. 105, at 33.) While the Court does not ordinarily endorse piecemeal responsive briefing, the Court will defer its decision on the amount of the award pending further briefing and hearings, as needed, on that point. The Government did not object to, or request further briefing as to, the "actual time expended" by Reyes-Romero's counsel or the recoverability of any incurred expenses. Therefore, those matters are now closed. The only issue to be resolved is the appropriate hourly rate.

---

[39] Counsel for Reyes-Romero updated his statement of billings to include attorney's fees for this Application for Fees. (*See* ECF 107-2.)

## IV.    Conclusion

Reyes-Romero is entitled to a Hyde Amendment award. He shall receive $1,007 in expenses plus 242.5 hours' worth of attorney's fees, the rate at which those fees will be calculated to be determined by this Court in further proceedings.

An appropriate Order will issue.

Mark R. Hornak
Chief United States District Judge

Dated: March 6, 2019
cc: All counsel of record